**BILLY BAXTER, INC., Plaintiff-Appellant,**

v.

**The COCA–COLA COMPANY and Canada Dry Corporation, Defendants-Appellees.**

**No. 697, Docket 34072.**

United States Court of Appeals, Second Circuit.

Argued April 9, 1970.

Decided Aug. 25, 1970.

Waterman, Circuit Judge, dissented and filed opinion.

James V. Joy, Jr., New York City (Greenburg & Adler, Lucille J. Becker, and Edward V. Egert, New York City, on the brief), for plaintiff-appellant.

Allan Blumstein, New York City (Paul, Weiss, Goldberg, Rifkind, Wharton & Garrison, and Paul R. Verkuil, New York City, on the brief for defendant-appellee The Coca-Cola Company. Dewey, Ballantine, Bushby, Palmer & Wood, Edward N. Sherry. and Robert A. Meister, New York City, on the brief for defendant-appellee Canada Dry Corp.), for defendants-appellees.

Before WATERMAN and ANDERSON, Circuit Judges, and WEINFELD, District Judge.*

ANDERSON, Circuit Judge:

Appellant Billy Baxter, Inc., is a Pennsylvania corporation organized in 1962 for the purpose of selling or otherwise

* Of the Southern District of New York, sitting by designation.

granting franchises authorizing the production and bottling of a line of non-alcoholic carbonated beverages under the federally-registered trademark "Billy Baxter." The beverages, which include club soda, quinine water, ginger ale, ginger beer, sarsaparilla, root beer, and "lime 'n quine" (quinine water containing lime), have been produced and sold locally in the Pittsburgh area by others since 1889, bearing the registered trademarks "Red Cross" and "Billy Baxter" since 1900 and 1921, respectively. In December of 1962, the appellant purchased the trademarks and secret beverage recipes, licensed the former owner to continue local production, and announced its intention to expand the availability of Billy Baxter products to new markets by franchising bottlers to manufacture and sell them.

Billy Baxter, Inc., admits that it played a circumscribed role in the subsequent limited expansion of Billy Baxter beverage product distribution, describing its business as "the purchase of beverage extracts and the sale of same to franchised bottlers, with related advertising and promotional activities."[1] From its office in Pittsburgh, Billy Baxter, Inc., bought various flavored extracts, which had been manufactured by others, and resold them to its franchised bottlers. The bottlers then manufactured the beverages by mixing these extracts with carbonated water, syrups, or other ingredients according to the specified secret formulae. The franchisee-bottlers sold the beverages in their geographic territories, remitting specified royalties to Billy Baxter, Inc., based on the number of cases of their products which they sold. The appellant franchisor had no plants or facilities other than its administrative offices in Pittsburgh and New York (where its president practices law); and in the normal course of business it "neither manufactured, bottled, distributed nor sold products" other than the extracts supplied to its franchisees.[2]

Four bottlers were licensed as Billy Baxter franchisees between 1962 and 1964, serving parts of Pennsylvania, Ohio, West Virginia, New Jersey and New York; and others also were approached and asked to test markets for the products. But Billy Baxter operations, which required that franchisees use a uniquely-shaped non-returnable bottle and distribute products which traditionally "sold at a higher-than-average cost,"[3] did not flourish. The appellant's gross income from sale of extracts and royalties, as well as "occasional" resale of some of its francisees' bottled beverages,[4] rose from some $18,000 during its first year to $45,500 in its second; but thereafter it declined precipitously, with three of the four bottlers ultimately relinquishing their franchises.

In 1966, Billy Baxter, Inc., commenced this action against the Coca-Cola Company and Canada Dry Corporation, Delaware corporations which manufacture various products and license bottlers to do the same, sweepingly alleging that they have violated various parts of the Sherman, Clayton, and Robinson-Patman

1. Response to Canada Dry interrogatories, ¶ 9.

2. *Id.*, ¶ 10. In ¶ 9, Billy Baxter, Inc. noted that "on a few occasions" it purchased bottled beverages from one or more of its franchised bottlers for resale. These occasions were elaborated in ¶ 24, which stated:

   "The Company did not sell products to customers who purchased from the company except in two instances. For a period of approximately three months during 1964, the company sold directly to Thoroughfare Supermarkets, Inc. (sales volume $10,925.00) and Giant Eagle Supermarkets, Inc. (sales volume $993.00), Pittsburgh, Pa. In addition, the company sold direct to Brussels Casino, Inc. (in 1964, sales volume $3,340.00) and Devil's Head Cafe (in 1965, sales volume $1,236.00), at the New York World's Fair."

3. Affidavit of William F. Adler, president of Billy Baxter, Inc., July 17, 1968, p. 2.

4. See note 2, *supra.*

Acts.[5] It contended that these two firms restrained competition in the "non-alcoholic carbonated beverage industry" in the five aforementioned states by agreeing to "avoid genuine competition with each other's primary product line." It further charged that they "acted in concert * * * to exclude plaintiff from the normal channels of interstate commerce, and through discriminatory, unfair and unlawful price concessions, discounts, gifts and allowances directed specifically to plaintiff's customers, induced them to exclude plaintiff's products from their places of business." The complaint alleged that these actions, followed by supplementary improper activities,[6] injured Billy Baxter, Inc., by causing "lost profits" estimated at $500,000; and it sought this amount trebled as damages.

Thereafter both Coca-Cola and Canada Dry served written interrogatories on Billy Baxter, Inc.; and the appellant's answers significantly narrowed the scope of the activities which were alleged to have caused harm to the franchisor's business. Billy Baxter, Inc., explained that the alleged market division injured it because Canada Dry was able to concentrate economic power in the "mixer market," using "advertising, price concessions, pricing of product and similar practices" to maintain market domination. But it added that these activities affected it specifically because of prac-

tices aimed at its "customers," listing as known examples three Pittsburgh hotels, two distributors, and a cocktail lounge allegedly induced to cease purchasing Billy Baxter products. In fact, none of these was a customer of the appellant Billy Baxter, Inc. Instead, each was a retail outlet or distributor which had purchased beverages from one of the franchised bottlers, which in turn paid royalties to the appellant.

After both the filing of the appellees' joint summary judgment motion and a special master's report on a motion to strike certain interrogatories, in each of which it was suggested that Billy Baxter, Inc. lacked standing to sue as a franchisor for its own lost profits on its franchisees' sales, appellant moved to amend both its complaint and its revealing answers to the interrogatories. It requested permission to file an amended pleading characterizing itself as a seller of bottled beverages purchased from its own franchised bottlers for resale, deleting its prior reference to "occasional" resales and describing the same two isolated sets of transactions as "substantial" retail sales.[7] Nevertheless, the district court found that this proposed verbal change did not alter the fact that "[a]t no time was plaintiff any part of the marketing operations of its licensees." Conclusory statements to the contrary

---

5. The original complaint alleged a single count for violation of the Sherman Act, 15 U.S.C. §§ 1–7, 15; the Clayton Act, 15 U.S.C. §§ 12–27; and the Robinson-Patman Act, 15 U.S.C. §§ 13, 15. The proposed amended complaint would have alleged four counts, the only one of which based on antitrust violation cited the Clayton Act, 15 U.S.C. §§ 12, 22, 26; the Sherman Act, 15 U.S.C. §§ 1, 2; and the Robinson-Patman Act, 15 U.S.C. § 13.

6. The complaint alleged that damage from the antitrust violations forced Billy Baxter, Inc. to try to sell its business, and that appellee Coca-Cola Co. interfered with this attempt. In its proposed amended complaint, the appellant characterized this and related claims as incidental to its basic claim of antitrust vio-

lations. The district court held that because the alleged attempt to sell the franchising business concerned a sale of stock, any claim based on interference would be vested in the Billy Baxter, Inc., stockholders rather than in the company. This holding has not been contested on appeal.

The complaint also alleged that appellee Canada Dry Corp. obstructed a proposed marketing program with a named dairy company; but since answers to the interrogatories disclosed that the program was actually that of Red Raven Corp., the franchised bottler which had owned the Billy Baxter trademark before 1962, the district court considered these allegations in conjunction with the antitrust standing arguments, *infra*.

7. See note 2, *supra*.

were found to be without factual basis;[8] and summary judgment was granted because Billy Baxter, Inc. was outside the "target area" of the alleged antitrust activities, the marketing of bottled beverages. Billy Baxter, Inc. v. Coca-Cola Co., 47 F.R.D. 345, 349–350 (S.D.N.Y.1969). We affirm.

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides:

"That any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor * * * and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

The statutory requirement that treble damage suits be based on injuries which occur "by reason of" antitrust violations expressly restricts the right to sue under this section. There must be a causal connection between an antitrust violation and an injury sufficient for the trier of fact to establish that the violation was a "material cause" of or a "substantial factor" in the occurrence of damage. Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 702, 82 S.Ct. 1404, 8 L.Ed. 2d 777 (1962); Bigelow v. RKO Radio Pictures, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946); Note, Standing to Sue for Treble Damages Under Section 4 of the Clayton Act, 64 Colum.L.Rev. 570, 575–6 (1964). And this connection must also link a specific form of illegal act to a plaintiff engaged in the sort of legitimate activities which the prohibition of this type of violation was clearly intended to protect. While any antitrust violation disrupts the competitive economy to some extent and creates entirely foreseeable ripples of injury which may be shown to reach individual employees, stockholders, or consumers, it has long been held that not all of these have the requisite standing to sue for treble damages and thereby take a leading role in the enforcement of the prohibition in question. See, e. g., Data Digests, Inc. v. Standard & Poor's Corp., 43 F.R.D. 386 (S.D.N.Y.1967). The private action, intended as "an ever-present threat to deter anyone contemplating business behavior in violation of the antitrust laws," Perma Life Mufflers, Inc. v. Int'l Parts Corp., 392 U.S. 134, 139, 88 S.Ct. 1981, 1984, 20 L. Ed.2d 982 (1968), can only serve as an effective deterrent if the courts are able to administer it with some degree of certainty. Contourless rules of causation would pose the threat of a parallel relaxation of the standard of business behavior enforced by the allowance of treble recovery. Consequently, a plaintiff must allege a causative link to his injury which is "direct" rather than "incidental" or which indicates that his business or property was in the "target area" of the defendant's illegal act. SCM Corp. v. Radio Corp. of America, 407 F.2d 166 (2 Cir.), cert. denied 395 U.S. 943, 89 S.Ct. 2014, 23 L.Ed.2d 461 (1969); Productive Inventions, Inc. v. Trico Products Corp., 224 F.2d 678 (2 Cir. 1955), cert. denied 350 U.S. 936, 76 S.Ct. 301, 100 L.Ed. 818 (1956). These terms do not provide talismanic guides to decision, but they do indicate the need to examine the form of violation alleged and the nature of its effect on a plaintiff's own business activities. See generally Pollock, Standing to Sue, Remoteness of Injury, and the Passing-on Defense, 32 A.B.A. Antitrust L.J. 5 (1966); Timberlake, Federal Treble Damage Antitrust Actions §§ 4.02, 4.03 (1965).

---

8. The district court also took note of the fact that Billy Baxter, Inc. had stated in its articles of incorporation that its corporate purpose was to sell or grant *franchises* authorizing others to bottle and sell trademarked beverages. The appellees contended below that the Pennsylvania Constitution and New York's Business Corporation Law § 1301(a) therefore prohibited Billy Baxter, Inc. from engaging in the business of manufacturing or selling the beverages themselves, and that the appellant never qualified to do business at all in New Jersey, Ohio or West Virginia. Billy Baxter, Inc. v. Coca-Cola Co., 47 F.R.D. 345, 349 (S.D.N.Y.1969).

In this case the only facts which Billy Baxter, Inc. alleges concern the use of improper methods to persuade retail outlets to buy products other than those manufactured and sold by the bottlers paying royalties to appellant.[9] There is no suggestion that any party approached the franchised bottlers and attempted to induce them to terminate their relationship with the appellant, or that any related steps were taken to interfere with the appellant's own franchising business. Cf. Schwartz v. Broadcast Music, Inc., 180 F.Supp. 322 (S.D. N.Y.1959). The only "target area" of legitimate activity indicated by the franchisor is the marketing of bottled beverages.

The appellant's claim to standing is not strengthened by the argument that the "target" was the line of Billy Baxter products rather than a specific "area" of economic activity in which the bottlers were engaged. Reference to the products as a target simply points to the self-evident fact that antitrust violations might do some damage to all the entities connected with their production and distribution. It is still necessary to examine a given plaintiff's role in these processes to determine whether it has the requisite relationship to the type of wrong alleged. Billy Baxter, Inc. was not only one step removed from the link in the production-distribution chain receiving the first impact of the alleged misconduct, but also it cannot claim to be a firm with comprehensive responsibilities for and identification with the beverages. Cf. Karseal Corp. v. Richfield Oil Corp., 221 F.2d 358 (9 Cir. 1955). It manufactured no products, and the bottlers did not act as its agents in doing so.[10] The franchisor merely licensed the information needed for the manufacture of the beverages, supplied ingredients which still others had manufactured, and left further production activities to its franchisees.[11] It would be meaningless to state that Billy Baxter, Inc. simply elected to carry on "its" business by authorizing others to bottle and sell the beverages, because the franchisor consciously structured the production-distribution process in a way which limited its own activities in order to gain the benefits of certain specific rights and liabilities.[12] Thus the district court did not enforce a standing rule allocating economic loss to arbitrarily-determined vertical levels of an enterprise, but relied upon the fact that the appellant had expressly limited itself to a level outside the economic target area of the offense. See Snow Crest Beverages, Inc. v. Recipe Foods, Inc., 147 F.Supp. 907, 909 (D.Mass.1956).

Similarly, the appellant's standing is not improved by the suggestion that the appellees, Coca-Cola Company and Canada Dry Corporation, were "its" competitors. The word "competitor" is no more instructive than the word "direct," if either is taken out of the context of the facts of a specific case. In its complaint, Billy Baxter, Inc. contends that both of these firms are manufacturers as well as franchisors of independent bottlers; and

9. The appellant stated in its answers to interrogatories that details of specific concessions, discounts, gifts, or allowances to the named retail beverage outlets, or to other beverage purchasers, were largely known only to the guilty appellees; but it did not contend that other types of conduct were involved.

10. The bottlers' franchise agreements specified that they were not made agents or representatives of the franchisor "for any purpose whosoever."

11. The appellant did reserve the right to inspect the processes and conditions at the bottlers' plants, and especially to have access to the bottlers' auditing systems and financial records. The franchise agreement stated that the "volume control," guaranteed by these inspection rights, was the franchisor's "primary means of appraising licensee's performance of this agreement," since it determined the size of royalties owed. Apart from the language of this agreement, the record contains no mention of the nature of the relations of Billy Baxter, Inc. with the bottlers.

12. For example, Billy Baxter, Inc. apparently did not qualify to do business itself in three of the states in which beverages using its trademark were marketed. See note 8, *supra*.

it is not clear whether the alleged discriminatory price concessions and discounts are claimed to have been made to promote the sale of beverages actually bottled by one of the appellees,[13] an activity in which it does not compete with the appellant, or to benefit sales in the five specified states by their franchised bottlers. In any case, even if the appellees violated the law to help themselves or their franchisees at the expense of the bottlers who sold Billy Baxter products, while knowing that this would also be an effective way of depriving a rival franchisor of royalties, the causal link between the type of violation alleged and an appropriate plaintiff would still be lacking in this suit. An interference with the marketing of beverages may interrupt profitable relationships and thereby harm a party which in effect "markets" franchises and ingredients, but the connection is not sufficiently compelling to support a treble damage suit.

The position of Billy Baxter, Inc., as a franchisor attempting to recover for this type of antitrust violation is not significantly different from that of a patent licensor suing for royalties lost because of injury to its patentee, SCM Corp. v. Radio Corp. of America, *supra*; Productive Inventions v. Trico Products Corp., *supra*; or of a supplier of ingredients suffering from a loss caused by an antitrust violation damaging the manufacturer and seller of a product, Volasco Prods. Co. v. Lloyd A. Fry Roofing C., 308 F.2d 383 (6 Cir. 1962), cert. denied 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717 (1963); Snow Crest Beverages, Inc. v. Recipe Foods, Inc., *supra*. Although Billy Baxter, Inc. licenses a trademark rather than a patent and also engages in certain advertising and promotional activities in support of this mark, we do not think this distinction suffices to give it standing to sue for damage caused by illegal interference with the marketing of its franchisees' products.[14] See, Nationwide Auto Appraiser Service, Inc. v. Association of Casualty & Surety Companies, 382 F.2d 925 (10 Cir. 1967).

Summary judgment was an appropriate remedy in this case, because the factual questions of motive and intent were not material to the appellant's standing. No genuine issue as to any material fact remained, because the nature of the appellant's injuries and the appellees' alleged activities were fully developed during two years of discovery and disclosure. Assuming the truth of appellant's extensive material factual allegations, they were nevertheless insufficient to show standing to sue. See SCM v. Radio Corp. of America, *supra*. Denial of the motion for leave to serve an amended complaint two months after filing of the appellees' summary judgment motion was also proper, since the verbal changes suggested would not have cured the absence of factual support for a showing of standing, indicated by prior judicial admissions.

The judgment is affirmed.

WATERMAN, Circuit Judge (dissenting):

I respectfully dissent from the action of my distinguished brethren in affirming the judgment entered below.

They agree with the respected judge below that, even if plaintiff-appellant's factual allegations are testimonially supportable, these allegations are not sufficient to demonstrate that appellant had standing to complain against the defendants.

---

13. The concessions and discounts alleged are attributed entirely to appellee Canada Dry Corp. The appellant contends that the Coca-Cola Co. is a participant in antitrust violations because of the alleged market division.

14. The appellant stated that it kept no separate records of advertising related to particular products, and its expenditures for various types of advertising and promotion on behalf of its trademark also were not itemized. The franchisor noted that an unspecified part of this advertising expense represented the cost of material supplied to the bottlers for use in their own local advertising.

I believe the plaintiff-licensor has standing to sue. I find it rather strange these days to deny access to a court of law to a plaintiff who alleges facts that show it has suffered compensable damage by reason of the action of others. Thus I am constrained to believe that my brother judges have accepted an anachronistic judicial gloss upon the phrase "by reason of" as that phrase appears in 15 U.S.C. § 15 (1964 ed.), a Code section derived from prior antitrust statutes, the Sherman Anti-Trust Act of July 2, 1890, 80 years old, and Section 4 of the Clayton Act of October 15, 1914, 55 years old.

Initial, or priming, coats of gloss were put on even before 1914, as when the Third Circuit was adjudicating a case brought against a well-known corporation pursuant to Section 7 of the Sherman Anti-Trust Act of 1890. The plaintiff's action there was demurred to and the lower court's judgment sustaining the demurrer was affirmed by the Third Circuit. In holding that this plaintiff had no standing to sue, it was said:

> There must exist some barrier which will effectually prevent such a multiplicity of suits as the plaintiff's position suggests, and we believe not only that that barrier exists, but that it is found now just where it was prior to the passage of the act in question. Loeb v. Eastman Kodak Co., 183 F. 704, 709 (3 Cir. 1910).

Should we not have in mind that those were the days when "privity" was king and even MacPherson v. Buick Motors, 217 N.Y. 382, 111 N.E. 1050 (1916) had not been written? Loeb was a stockholder and creditor of a corporation which had been ruined as a result of defendant's antitrust violations. The court reasoned, as I have just set out, that the antitrust statute was not intended to grant causes of action to a multiplicity of plaintiffs who could not have maintained suits against the defendant for compensable damages prior to its passage. It held that as the corporation was the party primarily injured and a stockholder's interest in lost profits is derivative, the private antitrust cause of action, as

with any other derivative cause of action, lay with the corporation. Accord, Ames v. American Telephone & Telegraph Co., 166 F. 820 (C.C.D.Mass.1909). Too, the court ruled that the same general principle applied to a creditor of an insolvent corporation which falls victim to antitrust violations, for creditors' interests are protectable by the trustee in bankruptcy who may institute an antitrust action in the creditors' behalf. The court, although appearing to recognize that Loeb had been damaged, wrote that any injury which he received was "indirect, remote, and consequential," id. 183 F. at 709, and the underlying reasoning of the decision (which I hasten to point out I am not denigrating) contemplated the existence of another person, the corporation or the trustee, each of which had a fiduciary relationship to plaintiff as stockholder or to plaintiff as creditor and who, directly harmed by defendants' conduct, was capable of bringing suit and in doing so would be protecting a stockholder's or a creditor's interest. The fiduciary, the proper party to institute the action, then, as envisaged by the court, would act as a conduit through which the stockholder's and creditor's damages would flow, for in the long run a successful suit by the corporation or its representative would presumably accrue to the benefit of its stockholders and its creditors. As to the standing of stockholders the court appeared to fear that if both those persons who possess truly derivative claims and the corporation, too, were allowed to bring suit, the defendant would be subject to damages in excess of treble the amount of the total actual damages inflicted upon the corporate entity and its stockholders by the antitrust conduct. Id. 183 F. at 823.

Further development by judicial construction of § 4 of the Clayton Act has led to disqualification of employees of a corporation from suing for the consequences they suffered in the aftermath of antitrust violations committed in the competitive market of which their employer was a part. See, e. g., Conference of Studio Unions v. Loew's Inc., 193 F.2d

51 (9 Cir. 1951), cert. denied, 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952); Westmoreland Asbestos Co. v. Johns-Manville Corp., 30 F.Supp. 389 (S.D.N.Y. 1939), aff'd, 113 F.2d 114 (2 Cir. 1940). But cf. Data Digests, Inc. v. Standard & Poor's Corp., 43 F.R.D. 386 (S.D.N.Y. 1967). Similarly, a lessor or landlord has been denied standing to sue for decreased rental payments due to antitrust activity affecting the business engaged in by the lessee, regardless of "whether the tenant [lessee] be a party to the violation * * or not." Lieberthal v. North Country Lanes, Inc., 221 F.Supp. 685, 690 (S.D. N.Y.1963), aff'd, 332 F.2d 269 (2 Cir. 1964); Melrose Realty Co. v. Loew's, Inc., 234 F.2d 518 (3 Cir.), cert. denied, 352 U.S. 890, 77 S.Ct. 128, 1 L.Ed.2d 85 (1956). Contra, in circumstances where the lessee is a party to the antitrust violation, Congress Building Corp. v. Loew's, Inc., 246 F.2d 587 (7 Cir. 1957). Patent licensors have likewise been held ineligible to sue for loss of royalty income because of antitrust violations directed at the licensee's business, SCM Corp. v. Radio Corp. of Am., 407 F.2d 166 (2 Cir.), cert. denied, 395 U.S. 943, 89 S.Ct. 2014, 23 L.Ed.2d 461 (1969); Productive Inventions, Inc. v. Trico Products Corp., 224 F.2d 678 (2 Cir. 1955), cert. denied, 350 U.S. 936, 76 S.Ct. 301, 100 L.Ed. 818 (1956), the case relied upon by the court below, see 47 F.R.D. 345, 350 (S.D.N.Y. 1969) and by my brothers. In like fashion, suppliers of ingredients to customers who have fallen victim to antitrust violations have been denied the benefit of an antitrust suit. Volasco Prods. Co. v. Lloyd A. Fry Roofing Co., 308 F.2d 383 (6 Cir. 1962), cert. denied, 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717 (1963); Snow Crest Beverages, Inc. v. Recipe Foods, Inc., 147 F.Supp. 907 (D.Mass. 1956). It would seem now that even franchisors are placed in the same category. Nationwide Auto Appraiser Service, Inc. v. Association of Casualty & Surety Companies, 382 F.2d 925 (10 Cir. 1967).

There seems to have emerged from a major portion of the cases interpreting the antitrust statutes a talismanic rule of lack-of-standing, presumably based in some fashion upon those now famous words "by reason of." If the plaintiff suffers injury from the defendant's illegal antitrust conduct, but the plaintiff is somehow separated from the defendant by the presence of an intermediate person who has also fallen victim to that conduct, the plaintiff's injury is given the label of an "indirect," "remote," or "consequential" injury. The label then dictates the outcome of the case and the plaintiff is denied a recovery regardless of the extent or the nature of plaintiff's loss, or of any other facts and circumstances, and regardless of whether a fiduciary relationship existed between plaintiff and the intermediate person. Many courts, so accepting label disposition, have tended thereby to view the standing-to-sue requirement in general terms and thus have denied all plaintiffs who fall into certain classes of persons—lessors, landlords, stockholders, corporate officers, creditors, suppliers, franchisors, licensors—antitrust protection by holding that when the business and property interests of such plaintiffs are injured because of injuries to the competitive market of persons with whom they are related or connected the plaintiffs' position vis-a-vis the offending defendants is "indirect." This is not to say, of course, that denying a plaintiff access to court by "label disposition" will always lead to a deplorable deprivation. Nevertheless, in deciding whether a plaintiff has standing to pursue the federally created cause of action codified in 15 U.S.C. § 15 it seems to me that perhaps the use by courts in antitrust opinions of inherited decisional labels may have obfuscated the positions of some plaintiffs so as to have denied them the recoveries which fact-analysis might have indicated they should have obtained.

Several courts, however, have resisted the adoption of labelous rules of standing-to-sue and have looked to some extent behind the "indirectness" label in an effort to preserve the basic policy considerations that give the standing-to-sue re-

quirement its viability. See, e. g., Sanitary Milk Producers v. Bergjans Farm Dairy, Inc., 368 F.2d 679, 688–689 (8 Cir. 1966); South Carolina Council of Milk Producers, Inc. v. Newton, 360 F.2d 414 (4 Cir.), cert. denied, 385 U.S. 934, 87 S.Ct. 295, 17 L.Ed.2d 215 (1966). One of these cases, decided some years ago, Karseal Corp. v. Richfield Oil Corp., 221 F.2d 358 (9 Cir. 1955), involved an antitrust action by a manufacturer of automobile polish which sold its product under the trade name of "Wax Seal" to enfranchised, but independently owned, distributors, which in turn resold the "Wax Seal" to independent service stations. The defendant, a sponsor of various automobile polishes and waxes other than "Wax Seal", was alleged to have violated the antitrust laws by entering into "exclusive dealing" agreements with service station operators thereby causing an unreasonable restraint of trade in the car wax industry and, in particular causing restricted sales of "Wax Seal" by plaintiff's enfranchised distributors, thereby diminishing the distributors' demands for "Wax Seal" from plaintiff. The court was undaunted by the fact that plaintiff stood in the shoes of one "indirectly" injured and held that plaintiff was entitled to maintain the action. In reaching this conclusion the court characterized the issue this way:

"[W]as Karseal within the 'target area' of [defendant] Richfield's illegal practices * * *? Assuming Karseal was 'hit' by the effect of the Richfield antitrust violations, was Karseal 'aimed at' with enough precision to entitle it to maintain a treble damage suit under the Clayton Act?" Id. at 362.

The defendants in Karseal applied illegal restraints at the level of the retail outlets, as defendants allegedly did in this case. The independent distributors in Karseal stood between the plaintiff and the retailers, as the bottlers stand between Billy Baxter and the retailers in the instant case. The Karseal court found that:

Primarily the operation and effect of the illegal practices was on the products (including Karseal's wax) which were competitive to the Richfield sponsored products. The impact was on the market. The gist of the violation was the prevention or impeding of the sale of these competitive products. Id. at 364.

Finally, the court observed:

To say to a manufacturer of wax that he may have the protection of the antitrust laws in private litigation if he hires salesmen for his product, and not have such protection if he decides to contract with a distributor, would appear to be an unequal application of the law and unjustified dictation as to how he operated his business. Id. at 364–365.

Appellees would distinguish Karseal because in that case the plaintiff supplied the finished product while in this case it is the plaintiff's franchisees who make up the finished products and bottle the beverages. The majority at page 188 would distinguish Karseal by saying appellant "cannot claim to be a firm with comprehensive responsibilities for and identification with the beverages." This analysis might have merit if plaintiff had not furnished the secret formulae extracts which served to make Billy Baxter's beverages unique and which gave the Billy Baxter beverages their competitive edge in the soft-drink industry. I submit, however, that Billy Baxter does have "comprehensive responsibilities for and identification with the beverages" sold under its brand name trademark.

Billy Baxter, as was Karseal, is the nerve center or the center of operations for the production and marketing of a "brand name" product. Billy Baxter's franchisees, as did Karseal's franchisees, perform functions ancillary to and in furtherance of, their franchisor's primary function and purpose, that of providing the consumer public a different and distinct product line and of promoting its products' good will and acceptability in a competitive market.

Several considerations lead me to believe that the majority is wrong in its assessment that appellant's relationship with its bottlers is not sufficiently close to bring it within the protection of the antitrust laws.

The majority points out that apart from the terms of Billy Baxter's written agreement with its bottlers, "the record contains no mention of the nature of the relations of Billy Baxter, Inc. with the bottlers." (Majority opinion, footnote 11). Unlike the majority, however, I find that the agreement referred to is of special significance. In relevant part the licensing agreement provides:

> 4. Licensee [bottler] shall strictly comply with the instructions, formulas and directions of Billy Baxter, which Billy Baxter may give from time to time in relation to the preparation, handling, bottling and distribution of Billy Baxter beverages * * *. Licensee shall furnish Billy Baxter with as many samples of Billy Baxter beverages as may be requested to enable Billy Baxter to test Licensee's compliance with the instructions hereinbefore described, and Licensee shall permit representatives of Billy Baxter, at all reasonable times, to inspect and investigate the processes, methods and conditions of Licensee's operation of its plant, and operation of the financial aspects of Licensee's business * * *.

The majority concludes that plaintiff's reserved right to inspect is primarily designed to guarantee "volume control" whereby performance could be ascertained and royalties determined. (Majority opinion, footnote 11). I think it is a fuller statement to add that the language of the agreement allows plaintiff to direct unqualifiedly the bottlers in their "preparation, handling, bottling and distribution of Billy Baxter beverages," and that inspections are not only designed to measure "volume" but in addition to insure "quality control." Plaintiff has an important stake in achieving and in insisting upon uniform standards of quality among the products its bottlers produce and distribute. This is not only very good business but is required legally. The majority fails to recognize that inasmuch as plaintiff owns the federally registered trademark that identifies the Billy Baxter beverages in the market, plaintiff is required to exercise reasonable supervision and control over licensees it allows to use the trademark so as to insure uniform standards of quality in all the Billy Baxter beverages produced by various bottlers, for lack of reasonable "quality control" works an abandonment of the licensor's registration of its trademark. Lanham Act, 15 U.S.C. § 1051 et seq., Dawn Donut Co. v. Hart's Food Stores, Inc., 267 F.2d 358, 367 (2 Cir. 1959).[1]

1. The legislative scheme may be briefly described. Section 5 of the Lanham Act, 15 U.S.C. § 1055 provides:

> Where a registered mark or a mark sought to be registered is or may be used legitimately by related companies, such use shall inure to the benefit of the registrant or applicant for registration, and such use shall not affect the validity of such mark or of its registration, provided such mark is not used in such manner as to deceive the public.

The concept of control is introduced by the Act's definition of "related company." 15 U.S.C. § 1127:

> The term "related company" means any person who legitimately controls or is controlled by the registrant or applicant for registration in respect to the nature and quality of the goods or services in connection with which the mark is used.

This court in *Dawn Donut* set forth the necessity for this policy of the Lanham Act:

> Without the requirement of control, the right of a trademark owner to license his mark separately from the business in connection with which it has been used would create the danger that products bearing the same trademark might be of diverse qualities (citing cases). If the licensor is not compelled to take some reasonable steps to prevent misuses of his trademark in the hands of others the public will be deprived of its most effective protection against misleading uses of a trademark. The public is hardly in a position to uncover deceptive uses of a trademark before they

Therefore, instead of merely licensing "information" to its licensees and then quietly sitting back to collect royalties, plaintiff was obligated to play a continuing role in overseeing its licensees' performance for plaintiff, as the trademark owner, was responsible, according to federal law, to the ultimate consumer lest the "public * * * be unwittingly deceived," *id.* at 367, and the penalty for failure to take active steps to supervise and control its licensees would be the loss of its registered trademark. Moreover, this affirmative duty that a licensor owes to the public to prevent diverse standards of product quality may well lead to a reciprocal liability for any injuries suffered by a consumer because of a lack of effective "quality control," and indeed may thereby constitute the relationship of the licensor to its licensee, depending upon the extent of the control reserved by the licensor, to be that of a principal liable for the acts of its agent. E. g., Nichols v. Arthur Murray, Inc., 248 Cal. App.2d 610, 56 Cal.Rptr. 728 (1967). See Note, The Franchisor as Plaintiff in Treble Damage Actions: An Antitrust Anomaly, 49 B.U.L.Rev. 322, 335–337 (1969); Note, Liability of a Franchisor For Acts of the Franchisee, 41 So.Cal.L. Rev. 143 (1967).

In short, the majority's classification of Billy Baxter, Inc. as an entity which "consciously structured the production-distribution process in a way which limited its own activities in order to gain the benefits of certain specific rights and liabilities" (majority opinion page 188) ignores the Lanham Act's imposition of affirmative duties that Act requires of licensors and which may substantially break down whatever insulation from liability a trademark licensor might have otherwise previously enjoyed. I, therefore, find it rather anomalous to conclude

that an enterprise owning a brand-name is not sufficiently identified with and not sufficiently responsible for the consistent quality of its brand-name products to have standing to prosecute an antitrust cause of action and yet, on the other side of the coin, is so sufficiently identified with these same brand-name products that the Congress, so as not to have the public deceived, has imposed affirmative responsibilities upon it to police its licensees in order to protect the integrity of the product in the consumer market.

Assuming the facts plaintiff alleges in its complaint are provable I cannot think of a more strained use of reason and of logic than to say that Billy Baxter was not "aimed at" by the defendants and was inadvertently hit as an "innocent bystander." See Perkins v. Standard Oil Co., 395 U.S. 642, 649, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969); Karseal Corp. v. Richfield Oil Corp., *supra* at 363. Can there be any doubt, again assuming the alleged facts to be provable, that the defendants' ultimate objective was to undermine the competitive position enjoyed by Billy Baxter trade name products in the beverage market? These allegations do not claim that defendants' aim was to eliminate competition in the beverage *bottling* industry but to eliminate the Billy Baxter brand-name beverage products from competition with defendants' brand-name beverage products. Here, in fact, under the allegations of this case, the bottlers are the businessmen who are secondarily or incidentally "hit." This proposition may be demonstrated by assuming that, because of defendants' conduct, the market for Billy Baxter beverages has been eliminated. Of course the bottlers who have been bottling those beverages are unable to continue doing so. However, it does not necessarily follow from the demise of

occur and will be at best slow to detect them after they happen. Thus, unless the licensor exercises supervision and control over the operations of its licensees the risk that the public will be unwittingly deceived will be increased and this is precisely what the Act is in part designed to prevent. See Sen. Report

No. 1333, 79th Cong., 2d Sess. (1946). Clearly, the only effective way to protect the public where a trademark is used by licensees is to place on the licensor the affirmative duty of policing in a reasonable manner the activities of his licensees. 267 F.2d at 367.

the Billy Baxter beverage market that the bottlers are eliminated from the pursuit of their business of bottling beverages. There still may exist a market for bottling, although that market may be that of bottling some other company's beverages—even perhaps the beverages of these defendants. There are, however, no alternatives open to Billy Baxter; its business is destroyed because its ability to compete has been destroyed.

Billy Baxter, therefore, is the principal, and the intended, victim of the defendants' illegal conduct, for the purpose for which defendants conspired was to keep Billy Baxter's trade name beverages off retail shelves; the defendants did not say to retailers, "don't stock beverages *bottled* by companies A, B, or C." The object of the defendants' conspiracy was not to put certain bottlers out of business; it was to scuttle Billy Baxter and the Billy Baxter trademarked brand-name in the relevant competitive market. Of course when the Billy Baxter business was scuttled Billy Baxter's franchisees would be damaged, but this would be so only because they happened to be bottling Billy Baxter products, not because they were the ultimate and principal targets aimed at. It was the plaintiff franchisor, not the plaintiff's franchisees, who was aimed at with such deadly accuracy and precision.

The fact that Billy Baxter provided for a financial structure between itself and its franchisees that contemplated the outright sale of the flavor extracts and a royalty for every case of beverages sold rather than providing for payment to its bottlers of a fee for bottling and distributing the beverages has no more significance than the outright sale of automobile polish to distributors had in Karseal v. Richfield Oil Corp., *supra.* To hold otherwise would be an unwarranted exaltation of form over substance. Billy Baxter's way of doing business did not insulate it from loss so that its elimination from the relevant market injured only its franchisees, for its way of doing business did not cause any unusual allocation of risks of financial loss between it and its franchisees if the market for Billy Baxter products should decline. The franchisees were not contractually obligated to purchase extracts from Billy Baxter except on a need-as-you-go basis. If the demand for Billy Baxter beverages slackened a Billy Baxter bottler's demand for extracts would diminish in like proportion. The ratio of commercial risk between them would be essentially the same whether Billy Baxter acted as its own distributor and paid the bottlers for bottling or whether it was agreed that title to the finished beverages would vest in Billy Baxter prior to distribution to the consuming public. The only risk of loss not assumed by Billy Baxter that the franchisees faced with respect to the finished products was the risk of loss of inventory if the market for Billy Baxter should collapse overnight, not a very significant factor over the long run.

This brings us to the point of inquiring whether this Billy Baxter case can be meaningfully distinguished from the apparent holding in the case of Productive Inventions, Inc. v. Trico Prods. Corp., *supra,* upon which my colleagues rely. Although the court in that case recognized that:

[N]o hard and fast rule can be laid down in these situations as the line between direct and incidental damage is not always definable with clarity. * * * Id. at 68.

and characterized the issue presented by the pleadings as a "limited" one, the court held that a patentee who has granted an exclusive license to a manufacturer, upon a royalty basis, could not maintain a treble damage action for recovery of damages for loss of royalties on sales that might have been made by the licensee save for defendants' antitrust violations. *Id.* at 679, 680. Relying on decisions denying relief to stockholders, employees, creditors and landlords, the court, in sweeping language, adopted the classical "indirect," "incidental," damage formula and denied the licensor-plaintiff standing to sue.

Our court held this even though the court appeared to recognize, *id.* at 680, n.

1, that "direct" damages suffered by the licensee for loss of sales and "indirect" damages suffered by the licensor for loss of royalties on the lost sales were different kinds of damages and appeared to recognize that under its holding neither the licensor nor the licensee could recover for the loss of the licensor's royalties, *id.* at 680.[2]

The *Trico Products* result is, I suggest, motivated by a judicial adherence to a notion that inasmuch as Congress has provided that affected plaintiffs may recover three-fold damages, i. e., may benefit by a "windfall," the courts should frustrate the legislation by preventing some persons damaged by proscribed unfair competition from sharing in the "windfall." The argument makes sense, of course, as long as one person is available to bring the antitrust suit, and the extent of the damages that he may recover is allocable between him and others similarly damaged because of the manner in which he and they are doing business. In such a situation the policy of Congress to encourage private antitrust actions by permitting the recovery of treble damages is not thwarted even if only the most directly affected person is allowed to bring the suit.

But if the person "most directly affected" does not have a relationship with another affected person of the sort that will permit him to recover the other's damages it is the defendant who reaps a "windfall." This "windfall" would seem to occur when conspiratorial defendants happen to direct antitrust activity at a vertically non-integrated enterprise rather than at a completely integrated one. In the latter case, a defendant guilty of antitrust conduct must pay three-fold the actual damages it inflicts. In the former, such a defendant need only pay three-fold the damages it inflicts on the first independently organized tier of the affected industry, thereby avoiding the full measure of its illegal undertakings. Whether particular guilty defendants will pay the full measure of what Congress prescribed, then, turns on how the innocent parties in the affected target enterprise chose to do business. Nothing in the congressional history of the antitrust legislation even remotely suggests that such an anomalous standard should be applicable in this field.

Of course it is apparent that a line must be drawn somewhere, as in all damage actions, for there is always a point where proof of damages becomes too difficult or too speculative. In the antitrust area that point is surely reached when the one claiming to be damaged by another's antitrust activity has too tenuous a relationship to the competitive market affected. Perhaps this consideration justifies the line drawn in Productive Inventions v. Trico Products—at least our court as of now has so drawn the line—but for the reasons I have stated I believe the line there drawn was drawn without examining the rationale behind the labels there relied upon, and, in any event, that case ought not support a decision moving the line over to bar out Billy Baxter. Billy Baxter's relationship to the relevant market is far from tenuous. Billy Baxter is directly in the retail market where it alleges defendants' violations occurred because it pre-sells it brand named products in the consumer's mind and, presumably in order to protect its own interest,

2.  This result appears to have been reached without having considered the reasons the early courts found dispositive based upon a justified fear that persons in privity with each other would recover for the *same* damages. As is said in 69 Harv.L. Rev. 575, 576 (1956) the result in Productive Inventions v. Trico Products permitted a defendant *to* escape a liability it should have been accountable for:

    Since the licensee was not obligated to pay the royalties to the plaintiff unless the patented articles were sold, the royalties could not be recovered by the licensee in a suit for damages based on the lost sales; they were a cost which the licensee had not incurred and which would have reduced its profit margin had the sales been made. The plaintiff has no remedy other than a suit under the antitrust laws. Thus, the defendant is permitted to escape liability for much of the harm caused by its unlawful conduct.

makes available business advice and promotes product quality control through inspections of its franchisees; the franchisee-bottlers, therefore, do not have the "inalienable right to *mismanage*" their own businesses. See Slater, Some Socio-Economic Footnotes on Franchising, 11 B.U.Bus.Rev. 19, 21 (1964). In contrast, the licensor in *Trico Products* was passive in the relevant market and left every aspect of the business to the manufacturer licensee.

I believe that this circuit has already reached or may have surpassed the permissible high watermark in this area in Productive Inventions v. Trico Products. The Supreme Court from time to time has instructed that the protection afforded by antitrust legislation is not to be restricted by niggling precepts or by artificial limitations. As far back as 1948 the Supreme Court in Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 236, 68 S.Ct. 996, 1006, 92 L.Ed. 1328 (1948) stated:

> The statute [Sherman Act] does not confine its protection *to consumers, or to purchasers, or to competitors, or to sellers.* Nor does it immunize the outlawed acts because they are done by any of these. \* \* \* The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated. \* \* \* (Emphasis added.)

See statements of similar effect in Radiant Burners, Inc. v. Peoples Gas, Light & Coke Co., 364 U.S. 656, 660, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); Radovich v. National Football League, 352 U.S. 445, 453–454, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957). See also Perkins v. Standard Oil Company of California, 395 U.S. 642, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969).

I would, therefore, reverse the judgment below entered after the grant of the summary judgment motion and would remand for further pleadings and proceedings.