**MINERSVILLE COAL COMPANY, Inc., et al., Plaintiffs,**

v.

**ANTHRACITE EXPORT ASSOCIATION et al., Defendants.**

**Civ. A. No. 68–428.**

United States District Court,
M. D. Pennsylvania.

Dec. 2, 1971.

Richard L. Hirshberg, Washington, D. C., Richard Wix, Harrisburg, Pa., for plaintiffs.

Stanley D. Robinson, New York City, for all defendants.

Victor Friedman, New York City, for defendant Glen Alden Corp.

Paul S. Lipson, New York City, for defendants Foreston Coal Co. & Foreston Coal Export Corp.

Russell J. O'Malley, Scranton, Pa., for Lehigh Navigation-Dodson Co.

Franklin B. Gelder, Scranton, Pa., for Anthracite Export Assn. & Blue Coal Corp.

James E. O'Brien, Scranton, Pa., for Blue Coal Corp.

Morey M. Myers, Scranton, Pa., for Lehigh Valley Anthracite Inc., Jeddo-Highland Coal Co. and James Tedesco.

## OPINION

MUIR, District Judge.

This matter is before the Court on Defendants' Motion for summary judgment against four plaintiffs[1] in this private antitrust action to obtain injunctive relief and recover treble damages for alleged violations of the Sherman and Clayton Acts.[2]

A summary judgment may be rendered only if the record, which, for this purpose, consists of the pleadings, depositions, answers to interrogatories, admissions on file and affidavits, shows that (1) "there is no genuine issue as to any material fact" and (2) "the moving party is entitled to a judgment as a matter of law." F.R.Civ.P. 56(c).

While "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of alleged conspirators, and hostile witnesses thicken the plot," Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed. 2d 458 (1962), the considerations which compel that approach are not present in the issue presented in the instant case.

The Defendants contend that four of the named Plaintiffs, West West Coal Co., H & P Coal Co., Woratyla Coal Co. and J. & C. Coal Co. lack standing to sue, as a matter of law, because any injury to them flowing from Defendants' alleged unlawful activities was "indirect, remote, and consequential."[3]

The Plaintiffs in this action are a group of corporations, partnerships and individuals which, between 1961 and 1968, were engaged in the business of mining, preparing, selling and exporting anthracite coal from coal fields in a ten-county area of northeastern Pennsylvania which contains 95% of United States anthracite reserves. The Defendants are nine companies which, during the period in question, were likewise engaged in some phase or phases of anthracite production and distribution and the Anthracite Export Association, an unincorporated association of coal producers formed in 1952 ostensibly for the purpose of promoting export trade in anthracite in accordance with the Webb-Pomerene Act.[4]

Prior to November 16, 1960, the solid fuel requirements of United States armed forces in Europe were met principally by procurement of coal and coke from European sources. In response to a Presidential Balance of Payments Directive of November 16, 1970, a radical shift in military procurement policies led to the re-examination of eligibility criteria for the solid fuel requirements of United States military installations in West Germany. During 1961 tests were conducted to determine whether domestic anthracite could be used in the equipment at such installations as a substitute for European solid fuel, and, at length, Pennsylvania anthracite meeting certain specifications[5] became an eligible

---

1. The original complaint in this action filed October 18, 1968, named sixty-five companies and individuals as plaintiffs. An amended complaint filed November 5, 1971, lists forty-six plaintiffs.

2. 15 U.S.C. §§ 1, 2 and 15.

3. Loeb v. Eastman Kodak Co., 183 F. 704, 709 (3d Cir. 1910).

4. 15 U.S.C. §§ 61–65.

5. The specifications called for the supply of egg, stove, and chestnut-sized anthracite with particular ash content and fusion characteristics, among other requirements.

fuel under the Army Program. Thereafter, beginning with fiscal year 1962, the United States Army purchased substantial quantities of Pennsylvania anthracite from European importers for its military installations in West Germany.

The complaint charges all of the Defendants with conspiracy to fix the prices of anthracite supplied by the Defendants under the Army Program, to divide and allocate among themselves the relevant Army procurement market and to limit participation in the Army Program to the Defendants and certain companies selected by them, to the exclusion of other producers, exporters, and importers, including Plaintiffs.

The Defendants contend that the four plaintiff companies against which they have moved for summary judgment, unlike the other plaintiffs, are mining companies, which, in the period in question, lacked the preparation facilities necessary to convert the raw coal mined by them into the types of processed coal which the Army purchased. They further contend that the injury, if any, to these mining companies stemming from Defendants' alleged violations of the Sherman and Clayton Acts could only have resulted from a diminution in these Plaintiffs' sales of raw coal to coal companies which possessed the necessary preparation facilities to produce coal meeting the Army's specifications. They argue that the preparation companies, who alone were in a position to compete with Defendants for the Army contracts, would have standing to sue under the antitrust laws for damages of a direct and immediate nature, but that any injury suffered by the four mining companies in question is remote and indirect because they were mere suppliers of the parties directly injured.

There is no genuine issue as to any fact material to a decision concerning this summary judgment. Although officials of the companies in question assert in their affidavits that H & P Coal Co.,[6] West West Coal Co., Inc.,[7] J & C Coal Co.,[8] and Woratyla Coal Co.[9] all possess rudimentary preparation facilities, it is undisputed that coal leaving these four companies' facilities must undergo further preparation processes before meeting the specifications of the Army Program.

We turn, therefore, to the state of the law in this Circuit on the question of standing to sue in antitrust cases.[10]

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides as follows:

"Any person who shall be injured in his business or property by reason of

---

6. In his affidavit, Joseph Hudock, a partner of H & P Coal Co., Llewellyn, Pennsylvania, states that he and his brothers and brothers-in-law obtained a lease from the Schuylkill County Commissioners to mine coal from Virgin coal lands on a royalty basis and that "automatic shakers were built to pick refuse and throw it away in nearby strip pits. This meant a higher recovery coal and *premium prices being paid for the coal at the preparation plants.* * * * *" (Emphasis supplied)

7. Leo Strenkowski states: "I have a cleaning plant whereby when the coal is dug from the ground, I immediately scalp the excess refuse from the material *so as to have a better prepared material for delivery to the preparation plant.* * * * *" (Emphasis supplied)

8. Joseph Walacavage, President of J & C Coal Co. states: "We, in our operations, actually help in the preperation [sic] of coal, when we extract coal from underground we run it through our cleaning plants and remove the larger pieces of rock or refuse that may be in the coal, before it continues through the preperation [sic] plants. * * * *"

9. Andrew Woratyla states in his affidavit: "At my operation, I extract coal from the ground. In this process I hand-pick the refuse from the raw material for ultimate delivery to the breakers. * * * I was directly affected by the monopoly and restraint of the army contract. The preparation plants could not get any orders for coal, therefore, our working time was cut down to two and three working days per week. This resulted in a drop in production. * * * *"

10. For a general survey of the law on this point up to 1964, see "Standing to Sue for Treble Damages Under Section 4 of the Clayton Act," 64 Colum.L.Rev. 570 (1964).

anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

In Loeb v. Eastman Kodak Co., 183 F. 704 (3d Cir. 1910) a plaintiff who was a creditor, and shareholder of a photographic supply house forced out of business by defendant's illegal conduct was denied standing to sue. In this landmark case, the court stated that prior to the passage of section 7 of the Sherman Act,[11] a shareholder in a corporation was without a direct remedy for an injury to his stock by reason of a wrong to the corporation, since the remedy in the first instance resided solely in the corporation, and the court interpreted the statute narrowly as one in derogation of common law, disallowing the plaintiff's suit qua shareholder. As an alternative ground for the same result, the court noted that no conspiracy or combination against the plaintiff stockholder was alleged and declared that "[t]he injury complained of was directed at the corporation, and not the individual stockholder," adding that any injury to a stockholder was "indirect, remote, and consequential." In his role as creditor of the corporation, the plaintiff in Loeb fared no better. The court held that a creditor "would apparently be injured in the same way and to the same extent as a stockholder," which, presumably, means the creditor lacks standing to sue because any injury to him is likewise "indirect, remote, and consequential." The latter holding, however, contradicts the alternative holding in the next paragraph of the opinion that the cause of action for injury to the creditor resides in the bankruptcy trustee. Notwithstanding the fact that the proposition that a plaintiff in an antitrust case lacks standing to sue for "indirect, remote or consequential" injury by reason of violation of the antitrust laws was an alternative holding in Loeb and to some degree inconsistent with its other holdings, Loeb has many times been cited for that proposition.

Loeb's progeny in this circuit include Harrison v. Paramount Pictures, Inc., 211 F.2d 405 (3d Cir. 1954), cert. denied, 348 U.S. 828, 75 S.Ct. 45, 99 L.Ed. 653 (1954), cited by Defendants, where in a brief per curiam opinion the Court of Appeals affirmed a District Court's denial[12] of plaintiff's motion for a judgment n. o. v. following a jury verdict for defendants. In Harrison, the plaintiff was the non-operating owner and lessor of a movie theatre whose lease entitled her to a percentage of the receipts, subject to a minimum rent. The lessor sued a motion picture producer and distributor, alleging that an agreement between the lessee and the defendants under which the theatre was operated as "second run" movie house rather than a "first run" movie house had the effect of lowering the potential receipts of the theatre and thereby diminishing the sums due the lessor under the percentage clause. The District Court denied the motion for judgment n. o. v. and then stated: "In view of the verdict, it is not strictly necessary to the disposition of the plaintiff's motions to pass upon the point made by the defendants that the plaintiff is not a person 'injured in his business or property' within the meaning of the antitrust laws and, therefore, is not entitled to maintain this action, regardless of what was shown as to the alleged unlawful conspiracy. However, I think that the de-

11. Section 7 of the Sherman Act was limited in its scope to violations of the Sherman Act and for that reason was superseded in 1914 by Section 4 of the Clayton Act, which broadened its scope to allow private suits for injury caused by "anything forbidden in the antitrust laws."

12. Harrison v. Paramount Pictures, Inc., 115 F.Supp. 312 (E.D.Pa.1953).

fendants are entitled, in the event of an appeal, to have a ruling upon it, and I shall, therefore, say that I agree that this plaintiff is not within the purview of the Act. . . ."[13] In dictum, the District Court went on to observe that under the lease plaintiff had no *right* to the sums which represented the percentage of the receipts in the sense that if the tenant, for whatever reason, had operated the business so as to keep the percentage from ever exceeding the minimum, "for example, by cutting admission charges, discontinuing advertising or showing nothing but foreign language or documentary films,"[14] the plaintiff-lessor could not have prevented it or sued successfully for what the percentage of the receipts might have been had the theatre been operated differently. The plaintiff's lease "divested her of almost all rights in connection with the tenant's operation of the business."[15] On plaintiff's appeal of the denial of the motion for judgment n. o. v. or a new trial, the Court of Appeals affirmed, per curiam, stating that the issues in plaintiff's appeal were fully considered and correctly decided against the plaintiff in the opinion of the District Court.

Defendants cite Melrose Realty Co. v. Loew's Inc., 234 F.2d 518 (3d Cir. 1956), cert. denied 352 U.S. 890, 77 S.Ct. 128, 1 L.Ed.2d 85 (1956) in which the court affirmed, in a Brief *per curiam* opinion, the District Court's entry of summary judgment against a plaintiff who, like the plaintiff in *Harrison,* was the non-operating owner and lessor of a movie theatre. Unlike Harrison, Melrose Realty Co. brought suit against the lessee-operator of the theatre, as well as the operator of a neighboring theatre, a motion picture exhibitor, motion picture distributors and a service company for

two of the defendants on the theory that the settlement entered into by the defendants in a separate antitrust suit constituted a conspiracy which resulted in diminished percentage rentals received by the plaintiff under its lease. Relying on the opinion of the Court of Appeals in *Harrison,* the District Court entered judgment for the defendants on the basis that the plaintiff theatre-owner lacked standing to sue. The Court of Appeals affirmed, stating that "[t]he rule thus laid down is sound and we adhere to it."[16] A Petition for Rehearing was denied over Chief Judge Biggs' dissenting view that "this court sitting en banc should review the very important issue presented."[17]

In Ash v. International Business Machines, 353 F.2d 491 (3d Cir. 1965) cert. denied, 384 U.S. 927, 86 S.Ct. 1446, 16 L.Ed.2d 531 (1966), the Court of Appeals reaffirmed the doctrine of *Loeb,* supra, that a shareholder lacks standing to sue a competitor corporation for injury to the value of his stock resulting from violations of the antitrust laws.

In Kauffman v. Dreyfus Fund, Inc., 434 F.2d 727 (3d Cir. 1970), cert. denied, 401 U.S. 974, 91 S.Ct. 1190, 28 L. Ed.2d 323 (1971), the Court of Appeals held that a shareholder in a mutual fund does not have a primary or personal cause of action to recover damages sustained by his corporation by reason of violations of the antitrust laws. In that case, the Court refused to distinguish between a shareholder in a mutual fund and a shareholder in a corporation.

We note in passing that in neither *Ash* nor *Kauffman* did the Court of Appeals cite *Harrison* or *Melrose Realty.*

■ The recent case of Knuth v. Erie-Crawford Dairy Coop. Assn., 395 F.2d 420 (3d Cir. 1968),[18] dealt with the

---

13. 115 F.Supp. at 315.

14. *Id.* at 316.

15. *Id.* at 316. The District Court noted that the lease of 1946 contained the words "on the earliest possible run" but concluded that this expression allowed "a good deal of latitude to the tenant."

16. 234 F.2d at 519.

17. 234 F.2d at 520.

18. Vacating in part and reversing in part the decision of the District Court.

prerequisites for pleading a claim upon which relief can be granted in an antitrust suit. The complaint in that case included an allegation that the plaintiff was directly damaged by certain conduct of the defendants, and the court stated: "Although the evidence may ultimately show that appellant's damage is not a direct result of the alleged boycott, we believe that for pleading purposes he has stated a damage claim under Section 4 of the Clayton Act." [19] Although the Court also stated that "[a]ll the law requires to state a private treble damage action claim are allegations adequate to show a violation of the antitrust acts and that plaintiff has been damaged thereby," [20] the requirements necessary to state a cause of action are distinct from the prerequisites of standing. Kauffman v. Dreyfus Fund Inc., 434 F. 2d 727, 733 (3d Cir. 1970). [21]

■ Although there is no appellate decision in this circuit which concerns a supplier's standing to sue [22] for antitrust violations which injure his purchaser in such a way as to diminish the supplier's sales to the purchaser, Melrose Realty Co. Inc. v. Loew's Inc., supra., appears to us to be indistinguishable from the instant case. There, the plaintiff-lessor was denied standing to sue, inter alia, his own lessee on the theory that the lessor's injury was remote and indirect. In the instant case, no injury to the four plaintiffs in question could be less remote than in Melrose Realty. Were we

not of the opinion that the law of this Circuit is still that laid down in Melrose Realty, we would be inclined to follow the approach of the Fourth Circuit in South Carolina Council of Milk Producers, Inc. v. Newton, 360 F.2d 414 (4th Cir. 1966), in which it was held that standing to sue is not limited to those in direct contractual or competitive status with the defendant and that a producer of raw—as opposed to processed—milk had standing to sue wholesale and retail sellers of processed milk for violations of the antitrust laws.

The standing requirement in antitrust litigation has recently been roundly criticized as "an anachronistic judicial gloss," [23] a petrifaction remaining from "the days when 'privity' was king," [23] and the courts have been accused of resorting to the unilluminating term or metaphor—"indirect"; "remote"; "consequential"; "target area"—which announces the result rather than analyzes the problem. [24] But as Judge Learned Hand wrote in his dissenting opinion in Spector Motor Service, Inc. v. Walsh, 139 F.2d 809, 823 (2d Cir. 1944), it is not "desirable for a lower court to embrace the exhilarating opportunity of anticipating a doc[t]rine which may be in the womb of time, but whose birth is distant; on the contrary I conceive that the measure of its duty is to divine, as best it can, what would be the event of an appeal in the case before it." It appears

19. 395 F.2d at 425.

20. Ibid. at 423.

21. On remand, the District Court dismissed the antitrust counts for the reason, inter alia, that plaintiffs lacked standing to sue. Knuth v. Erie-Crawford Dairy Cooperative Assn., 326 F.Supp. 48 (W.D. Pa.1971), appeal docketed 71–1541 through 71–1548, 3d Cir.

22. For discussions of the standing of suppliers, see Karseal Corp. v. Richfield Oil Co., 221 F.2d 358 (9th Cir. 1955); Volasco Prods. Co. v. Lloyd A. Fry Roofing Co., 308 F.2d 383 (6th Cir. 1962), cert. denied, 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717 (1963); Snow Crest Beverages, Inc. v. Recipe Foods, Inc.,

147 F.Supp. 907 (D.Mass.1956); Billy Baxter Inc. v. Coca-Cola Co., 431 F.2d 183 (2d Cir. 1970); South Carolina Council of Milk Producers, Inc. v. Newton, 360 F.2d 414 (4th Cir. 1966); and Sanitary Milk Producers v. Bergjans Farm Dairy, Inc., 368 F.2d 679 (8th Cir. 1966).

23. See the dissenting opinion of Judge Waterman in Billy Baxter, Inc. v. Coca-Cola Company, 431 F.2d 183, 190 (1970).

24. See the provocative proposals in Handler, "The Shift from Substantive to Procedural Innovations in Antitrust Suits—The Twenty-Third Annual Antitrust Review," 71 Colum.L.Rev. 1, 24–31 (1971).

appropriate in the instant case to forego that exhilaration.

Defendants' motion for summary judgment will be granted.