**HARRISON v. PARAMOUNT PIC-
TURES, Inc. et al.
Civ. No. 12203.**

United States District Court,
E. D. Pennsylvania.
Sept. 11, 1953.

9. Ways and Means Committee—HR R. No. 704, 73d Cong. 2d Sess. § (4).

10. 26 U.S.C.A. § 500 et seq.

Harry Norman Ball, Morris L. Weisberg, Philadelphia, Pa., for plaintiff.

Wolf, Block, Schorr and Solis-Cohen, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for defendants.

KIRKPATRICK, Chief Judge.

The plaintiff's chief criticism of the charge of the Court is directed against one or two sentences, which have to be taken completely out of context in order to furnish any basis for the plaintiff's argument. I do not see how any one who listened to the entire charge, or who reads it, could get the idea that when the Court, at one point, said, "Of course, if you determine that those clearances imposed generally were reasonable throughout the district there * * * that would be the end of the case," the Court was talking about the length of time of the various clearances—whether seven, fourteen or twenty-one days, for example —which is the meaning which the plaintiff apparently takes.

There never was any question in the case about the reasonableness or unreasonableness in point of time of any particular clearance. The plaintiff attacked the existence of any and all clearances favoring competing theatres. In fact, one thing which she complained of was removing a clearance which had been imposed upon another theatre. The issue submitted to the jury was whether the sum total of the defendants' dealings with the Main Line group of theatres resulted in an unreasonable restraint of competition. The interrogatories did not ask whether the clearances were reasonable but whether "changes in clearances and runs" among the Main Line theatres were reasonable.

The Court was correct in charging that, if what the defendants did did not unreasonably restrain competition, the fact that they may have acted in concert would not establish a violation of the Act, and that, therefore, if the jury found

that there had been no unreasonable restraint, the question relating to the existence of a combination among the defendants need not be answered. This is the rule of Standard Oil Company of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 515, 55 L.Ed. 619, and any number of other decisions following the case. In the Standard Oil case the Court said, "The statute under this view evidenced the intent not to restrain the right to make and enforce contracts, whether resulting from combinations or otherwise, which did not unduly restrain interstate or foreign commerce * * *."

The jury was charged fully and, I believe, correctly upon the various matters which they were to consider in determining whether the restraint as a result of which the Bryn Mawr Theatre for a considerable period of time occupied a second-run position was reasonable or unreasonable. The charge recognized that it is the law that, if the purpose of a combination is to establish a monopoly, a restraint, otherwise reasonable, may be unlawful. The Court charged, "On the other hand, as I say, if the real purpose here was simply to favor the Warner theatre, which was the Ardmore Theatre, for various reasons—you have heard about the situation in Philadelphia where Warner had a tremendous buying power, as did the Warner theatres all over the country, and the condition of the whole industry, and the fact that these monopoly powers undoubtedly did, or at least were found by the decree of the court to exist—and if the sole purpose was not a reasonable business purpose but was merely to keep a favored theatre ahead of a competitor, then you could find that the clearances were unreasonable. That is one of the things you must ask yourselves." The Court also charged, "Where a similarity of the business practices of certain of the defendants results from nothing more than a common business solution of identical problems in a local competitive area, then you should find that there was no conspiracy."

Clearances of necessity are restraints upon competition, but clearances are not illegal per se, and after all the facts and circumstances have been considered, the ultimate question in this case, as in all anti-trust cases, is whether the action of the defendants "springs from business requirements or purpose to monopolize," U. S. v. Columbia Steel Co., 334 U.S. 495, 527, 68 S.Ct. 1107, 1124, 92 L.Ed. 1533. Evidence of an agreement or combination among defendants may disclose a purpose to monopolize, and in the present case all the evidence which the plaintiff offered bearing upon the question of concert of action among the defendants was received and the jury was instructed to consider it.

The plaintiff also argues not only that the Court's instructions upon the scope and effect of the Paramount decree were inadequate and incorrect, but also that, having offered the decree in evidence, she was entitled to a directed verdict.

As to the instructions: Emich Motors Corp. v. General Motors Corp., 340 U.S. 558, 571, et seq., 71 S.Ct. 408, 95 L.Ed. 534, allows a wide discretion to the trial judge in the difficult task of explaining to the jury what was really involved in an extremely complicated proceeding in another court and telling them what effect the many elaborate provisions of the decree in that proceeding should have upon their consideration of the case before them. The Court endeavored to discharge his duty in this respect by making the explanation as simple and as much to the point as possible, while preserving to the plaintiff every practical advantage to which the decree entitled her. The Supreme Court, in the Emich case, said "As to the manner in which such explanation should be made, no mechanical rule can be laid down to control the trial judge, who must take into account the circumstances of each case. He must be free to exercise 'a well-established range of judicial discretion'." 340 U.S. at page 571, 71 S.Ct. at page 415. I think that the explanation was adequate,

and it was entirely discretionary with the Court to decline to give the jury the decree to take out with them—a document which would probably have merely bewildered them and brought on discussion of all sorts of extraneous matters.

As to the plaintiff's contention that she is entitled to judgment notwithstanding the verdict: The Emich case does not hold, as I understand the plaintiff to argue, that, with the Paramount decree in evidence, a plaintiff is entitled to a directed verdict if he can show some injury resulting from the acts of the defendants. The point of the Emich decision was that the decree in the Government suit is prima facie evidence, not only of the existence of a conspiracy, but also of the means used by the defendants to effectuate it. The case decided what matters the prima facie case covered, but there is nothing in the opinion to support the plaintiff's argument that the presumptions arising from the decree in favor of the United States are conclusive and incontrovertible. It is hardly necessary to say that the references to estoppel in Section 5 of the Clayton Act merely define the area which the prima facie case covers.

■ The jury rendered a verdict in favor of the defendants and it was recorded. Counsel for the plaintiff then requested that the jury be polled. The Court might have denied the request (Alusa v. Lehigh Valley R. Co., D.C., 26 F.2d 950; Rottmund v. Pennsylvania Railroad Company, 225 Pa. 410, 74 A. 341), but was reluctant to do so on any technical ground and the jury was polled. The responses of one of the jurors, although somewhat confused, indicated to the Court that he was not in accord with the verdict. The Court instructed the jury to retire and reconsider the verdict, stating that only a unanimous verdict could be received. After about an hour of further deliberation the jury returned with a verdict for the defendants, was polled again, and the juror in question then registered his unqualified agreement.

■ "The correct practice, when a poll of the jury is asked, is for the clerk to call the roll and ask each juror as his name is called to answer—for the plaintiff, or—for the defendant, and if the responses of the individual jurors are not in complete agreement, the jury should be required to retire and give further consideration to the case." Bruce v. Chestnut Farms-Chevy Chase Dairy, 75 U.S.App.D.C. 192, 126 F.2d 224, 225.

There was nothing remotely resembling coercion in what the Court said to the juror. The Court endeavored to find out what the juror intended his verdict to be and declined to discuss his mental operations with him. The juror gave several contradictory answers but the Court finally came to the conclusion that he was not in agreement with the others and said, merely, "Well you will have to retire then, members of the jury."

In view of the verdict, it is not strictly necessary to the disposition of the plaintiff's motions to pass upon the point made by the defendants that the plaintiff is not a person "injured in his business or property" within the meaning of the antitrust laws and, therefore, is not entitled to maintain this action, regardless of what was shown as to the alleged unlawful conspiracy. However, I think that the defendants are entitled, in the event of an appeal, to have a ruling upon it, and I shall, therefore, say that I agree that this plaintiff is not within the purview of the Act, and shall state my reasons briefly:

Parenthetically, the stipulation of counsel which governed the trial procedure does not, as the plaintiff argues, preclude the defendants from raising the question. That stipulation covered two points. The first was that the issues of liability and damages should be tried separately. The second was that the only question to be submitted to the jury in the trial of the issue of liability would be whether the defendants had violated the anti-trust laws. If the plaintiff has no right, whatever her proof, to recover against these defendants, there is no liability. The question of the plaintiff's

right arises in connection with the issue of liability, which is what is being tried, and has nothing to do with the postponed issue of damages.

The plaintiff has not shown and does not allege that she has ever had any business transactions with the defendants. She is not in the business of operating a motion picture theatre. The percentage provision of the leases merely gave a basis on which her rent could be computed and did not make her a partner in the business or give her any interest in it. Nor is she in the real estate business.

■ Whether or not any anti-trust plaintiff has been injured in his property depends upon two things, first, what the nature of the property is and, second, how remote the injury is.

"Injury" (under Section 4 of the Clayton Act) "implies violation of a legal right." Keogh v. Chicago & Northwestern Railway Company, 260 U.S. 156, 43 S.Ct. 47, 49, 67 L.Ed. 183. In the popular sense of the word, this plaintiff "owns" the building, but her "property" in it consists entirely of the right to the reversion after the expiration of the lease, plus the rights which she has retained by the leases in respect of it. There is no such thing as a conspiracy against a building, and the plaintiff's injury, if any, can only arise from a violation or impairment of such rights in the property as she has.

The plaintiff contends that she has been injured in her property in two ways. First, she says that if the theatre had been operated by the tenant showing pictures on first-run, the receipts would have been greater and she might have obtained a larger rental, by way of percentage, than she did. The fact is that while she would have had a right to rental above the minimum, if earned, she had nothing more than a hope that it ever would be earned. The tenant could have operated the business, from whatever motive, so as to keep the percentage from ever exceeding the minimum, for example, by cutting admission charges, discontinuing advertising or showing nothing but foreign language or documentary films, and there would be no right which the plaintiff could have asserted against him in that respect.

■ Second, the plaintiff claims that the fact that the theatre operated as a second-run house for a considerable period of time during the terms of the leases has depreciated its value. Of course a history of successful and profitable operation is always a good thing for the value of any business property, but I do not know of any way in which a landlord can compel his tenant to run his business so that he will make money. A landlord can of course, by provisions in the lease, control the tenant's operation as much as he pleases, as to the kind of business to be done, classes of commodities to be sold or in a motion picture theatre the kind of picture to be shown, but this plaintiff did not do so. On the contrary her leases divested her of almost all rights in connection with the tenant's operation of the business. As to the type of picture which the tenant could show, her rights were practically nil. The first two leases, those of 1926 and 1936, contain no restrictions whatever on the point. Leaving out of consideration numerous provisions relating to upkeep, repairs, subletting and default clauses, the only mention of operation occurs in two clauses, one of which is nothing but a stipulation against undesirable forms of entertainment and permits moving pictures, without limiting the type of picture to be shown, and the other provides against the tenant's closing the theatre entirely for more than three months in a year. The lease of 1946 adds to the provision permitting showing motion pictures the words "on the earliest possible run"—an expression allowing a good deal of latitude to the tenant.

However that may be, it is apparent that if this landlord has any rights at all in the property which could be injured by a conspiracy to withhold first-run pictures, directed against or partici-

pated in by the tenant, they are remote, uncertain and insubstantial.

This is not a case in which by reason of the unlawful acts of the defendants a tenant has been forced to default in his rent. That situation need not be considered here. Of course, this landlord did have a definite and substantial right to the minimum rental, but she has received that at all times, in full.

But even if it be assumed that the plaintiff had some property, some right, which was susceptible of injury, and that such injury could be traced to the acts of the defendants, the question of remoteness remains. This question takes on greater importance in the case of an anti-trust plaintiff who has never had any business transactions with the defendants than in the case of one who claims injury through direct business dealings with them. The difficulties which would arise unless some consideration be given to the remoteness or indirectness of the injury are particularly apparent in the motion picture business, in which thousands of theatres are owned by persons who have nothing to do with the operation of them and no right to interfere. In this particular case, the complaint charges that from 1940 on the tenant was a party to an agreement with the defendants for the operation of the Bryn Mawr Theatre as a second-run house. There was nothing in his lease to prevent him from so operating if he wished to, and it can be assumed that he found it more profitable to do so. In such a situation, where a tenant desires a particular kind of product, must the distributors seek out the owner of the building to ascertain whether they can safely give the tenant what he wants? It seems clear that unless a line is drawn excluding remote and indirect injuries to property owners in similar cases, an almost intolerable burden would be placed upon the whole industry.

There are not a great many decisions dealing with the scope of the term "injury in his business or property", and such as there are are far from being in accord or establishing any clearly defined rule. It is generally recognized that stockholders, creditors or employees of a corporation do not come within the Act. Inasmuch as such persons undeniably suffer injury to their property when the corporation is injured, it would seem that the courts recognize that the Act does not give a right of action to every one who can trace a financial loss, however remote, to a violation of the anti-trust laws.

 In determining the scope of the Act it must be remembered that the treble damage feature is an enforcement provision and superimposes a penalty upon compensation. As such it should not be literally construed if unreasonable results would be reached by so doing. Obviously, there must be a limit somewhere. It is not possible to formulate any general rule by which to determine what injuries are too remote to bring a plaintiff within the scope of the Act and I shall not attempt to do so. Each case must be dealt with on its own facts. All that is decided here is that this plaintiff's loss, if any, is beyond the limit of injuries cognizable under the anti-trust laws.

The motions are denied.