**AL BARNETT & SON, INC., et al., Plaintiffs,**

v.

**OUTBOARD MARINE CORPORATION, Defendant.**

**Civ. A. No. 4453.**

United States District Court, D. Delaware.

Aug. 13, 1974.

As Amended Sept. 3, 1974.

---

Arthur G. Connolly, Jr., of Connolly, Bove & Lodge, Wilmington, Del. and John T. Synnestvedt and J. Donald McCarthy of Synnestvedt & Lechner, Philadelphia, Pa., of counsel, for plaintiffs.

Arthur G. Connolly, Jr., of Connolly, Bove & Lodge, Wilmington, Del. and Miles W. Kirkpatrick, Thomas A. Masterson and Stephen W. Armstrong of Morgan, Lewis & Bockius, Philadelphia, Pa., of counsel, for The National Marine Distributors Ass'n, amicus curiae.

James M. Tunnell, Jr., William O. LaMotte, III and William H. Sudell, Jr., of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., and Max H. Fruhauf of Butzel, Levin, Winston & Quint, Detroit, Mich., of counsel, for defendant.

## OPINION AND ORDER

LATCHUM, Chief Judge.

Plaintiffs' motion presently before the Court seeks an order pursuant to Rule 23(c)(1), F.R.Civ.P., to maintain this case as a class action.

This private antitrust suit charges the defendant with violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15 U.S.C. § 14. Jurisdiction is based on Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. The plaintiffs seek to recover treble damages, suit costs, including reasonable attorney fees, and to obtain injunctive relief for alleged injuries to the business and property of the plaintiffs and the members of the class they purport to represent.

Specifically, the second amended complaint charges the defendant with restraining trade in certain marine accessory products by illegally tying the sales of those marine products to the sales of defendant's Evinrude and Johnson outboard motors. The marine accessory products involved are: (1) remote control cables used for steering and throttling outboard motors, (2) propellers of various sizes and configurations which are attached to outboard motors in order to drive boats through the water, (3) fuel tanks set or placed in boats and connected to the outboard motors by flexible tubing and (4) two types of remote control boxes, viz., electrical shift control boxes and hydraulic shift control boxes.[1]

The three named plaintiffs are: Al Barnett & Son, Inc. ("Barnett"), a New York corporation with its principal place of business in Farmingdale, New York; Marine Wholesale, Inc. ("Marine Wholesale"), an Oregon corporation with its principal office in Portland, Oregon; and Tri-State Marine, Inc. ("Tri-State"), a New Jersey corporation with its principal office in Carlstadt, New Jersey. The complaint alleges that the named plaintiffs are independent wholesale marine distributors who sell one or more of the marine accessory products involved which are capable of being used with defendant's outboard motors but are manufactured by others than the defendant.

The defendant is Outboard Marine Corporation ("OMC") a Delaware corporation with its place of business at Waukegan, Michigan. OMC, which manufactures Evinrude and Johnson outboard motors, sells such motors and marine accessories to its franchised marine dealers. The plaintiffs claim that by

---

1. From 1968 through the 1971–72 outboard model year, the defendant manufactured and sold outboard motors with electrical mechanisms for shifting the gears of the motors and such motors required electrical shift control boxes with appurtenant wire harness. Beginning with the 1972–73 model year defendant manufactured and sold outboard motors with hydraulically assisted, mechanical shift mechanisms with appurtenant harness, either of which boxes are necessary to control the outboard motor shift mechanisms. For a more detailed description of control cables and boxes, see N. W. Controls, Inc. v. Outboard Marine Corporation, 333 F.Supp. 493 (D.Del. 1971).

various marketing devices and practices OMC has effectively tied the sales of the marine accessory products involved to the sales of its outboard motors by requiring its marine franchised dealers to purchase the tied products from OMC with the consequence that the plaintiffs have been practically precluded from selling their competing marine accessories to OMC dealers.

The named plaintiffs allege that they represent a class composed of independent marine distributors who sell at wholesale one or more of the marine accessories involved that are usable with OMC outboard motors but are manufactured by entities other than OMC. Contending that all the requirements of Rule 23(a), F.R.Civ.P., have been satisfied, the plaintiffs urge the Court to permit the case to be maintained as a class action under Rule 23(b)(3) because questions of law and fact common to the members of the class predominate over any questions affecting only individual members and that the class action is superior to all other available methods for the fair and efficient adjudication of the controversy.

The National Marine Distributors Association ("NMDA"), a non-profit association of some fifty-four marine distributor members, was granted leave to file a brief as *amicus curiae* in support of plaintiffs' position that the suit should be maintained as a class action. OMC vigorously resists the certification of the case as a class action.

## I. REQUIREMENTS FOR MAINTENANCE OF CLASS ACTION.

Subdivision (a) of Rule 23 sets forth four mandatory prerequisites to the maintenance of any suit as a class action: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interest of the class."

In addition to meeting the four conjunctive requirements of 23(a), a class action must also qualify under one of the three subdivisions of 23(b). The plaintiffs contend the action is maintainable under 23(b)(3).[2] That subdivision requires the Court to determine whether "questions of law or fact common to the members of the class predominate over any questions affecting only individual members" and whether "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." In resolving the issue concerning the propriety of a suit under 23(b)(3), the Court is required to assess various factors, including among others "(A) the interest of the members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;" and "(D) the difficulties likely to be encountered in the management of the class action."

In order for this case to qualify for class action treatment, the plaintiffs have the burden of showing that each of the four prerequisites of Rule 23(a) are satisfied and, in addition, that the two

2. Most courts that have considered the matter have held that class actions seeking treble damages in addition to injunctive relief involving alleged violations of federal antitrust laws cannot ordinarily be maintained under either 23(b)(1) or (2), Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 564–565 (C.A.2, 1968); Contract Buyers League v. F. & F. Investment et al., 48 F.R.D. 7 (N.D.Ill.1969); William Goldman Theatres, Inc. v. Paramount Film Distributing Corp., 49 F.R.D. 35 (E.D. Pa.1969); cf. Minnesota v. United States Steel Corp., 44 F.R.D. 559 (D.Minn.1968), but are usually maintained under 23(b)(3). 6 A.L.R.Fed. 48.

48

additional requirements of 23(b)(3) are met. City of Philadelphia v. Emhart Corp., 50 F.R.D. 232 (E.D.Pa.1970); Weisman v. MCA Inc., 45 F.R.D. 258 (D.Del.1968); Philadelphia Electric Co. v. Anaconda American Brass Co., 43 F.R.D. 452 (E.D.Pa.1968).

With these principles in mind, the Court first turns to consider whether the four mandatory prerequisites of Rule 23(a) have been met so that this case may be certified for class action.

## II. RULE 23(a) REQUIREMENTS.

The parties do not appear to be in sharp disagreement with respect to the questions whether the requirements of Rule 23(a)(2) and (3) have been met. OMC apparently concedes[3] that there are *some* issues of law and fact, for example, OMC's marketing practices of the marine products involved and OMC's market power, are common to the defined class, although it denies these common issues predominate as required by Rule 23(b)(3). As to whether the claim of the class representatives are "typical" of the class as mandated by 23(a)(3), the parties have devoted very little argument. This lack of discussion may have been due to doubt of the precise meaning of that clause, Minnesota v. United States Steel Corp., 44 F.R.D. 559, 566 (D.Minn. 1968), or because many courts have equated the "typical" requirement with the 23(a)(2) requirement that common questions exist. American Airlines, Inc. v. Transport Workers Union, 44 F.R.D. 47 (N.D.Okla.1968); Rakes v. Coleman, 318 F.Supp. 181, 190 (E.D.Va.1970); Iowa v. Union Asphalt & Roadoils, Inc., 281 F.Supp. 391, 401 (S.D.Iowa 1968), aff'd 409 F.2d 1239 (C.A.8, 1969). In any event for whatever reasons, OMC has not seriously contested the plaintiffs' allegation that the Rule 23(a)(3) requirement has been met.

OMC does vigorously deny, however, that the Rule 23(a)(1) and (4) requirements have been fulfilled.

█ As previously noted Rule 23(a) (1) requires the class be so numerous that joinder of all members is impracticable. The resolution of what constitutes "impracticability" depends ". . . upon all the circumstances surrounding a case." ". . . courts should not be so rigid as to depend upon numbers as a guideline on the practicability of joinder." Demarco v. Edens, 390 F.2d 836, 845 (C.A. 2, 1968).

█ On the other hand, while the number of prospective class members is not determinative of the practicability of joinder, it is a significant factor to be considered. Fidelis Corp. v. Litton Industries, Inc., 293 F.Supp. 164, 170 (S.D. N.Y.1968). That factor however can not be properly assessed and weighed where the plaintiffs fail to satisfy the Court of the approximate size of the class that they seek to represent. Sims v. Parke Davis & Co., 334 F.Supp. 774 (E.D.Mich.1971), aff'd 453 F.2d 1259 (C.A. 6, 1971), cert. den. 405 U.S. 978, 92 S.Ct. 1196, 31 L.Ed.2d 254 (1972). In the present case, the named plaintiffs have submitted a list containing the names of 650 possible class members and have variously estimated the class from a rock-bottom figure of 33 members and at other times as 66 members or in excess of 100 members. Some closer and reasonable approximation of the number of possible class members must be established at the time of certification. The difficulty in this case in making a reasonable approximation of the number of class members arises from the difficulty of determining who falls within the class member definition. This is so because there is no objective criterion for determining potential class members. In the typical antitrust class action objective factors exist to serve to identify the class members, for example, such as a franchise agreement in a suit by franchisees against a franchiser or purchase invoices in a suit by purchasers against alleged price fixers. In the present suit

3. Docket Item 74.

it is necessary to make a subjective determination with respect to each prospective class member. The class sought to be represented are those independent marine distributors who sell at wholesale one or more of the five marine acces-. sories involved that are usable with OMC outboard motors but manufactured by others than OMC. In addition, plaintiffs concede that it is necessary to determine whether the wholesale distributor was a vendor of some of the marine products in question to OMC's Johnson and/or Evinrude dealers because it is to those retail dealers that the sales, which plaintiffs claim to have lost, would have been made but for OMC's alleged unlawful practices. Thus, it is necessary to make a subjective determination with respect to each prospective class member as to whether he would have sold more of any kind of the marine products in suit but for OMC's practices. Hence proof of the fact of injury and proof of the fact of membership in the class are one and the same. Short of full scale litigation with respect to each prospective member of the class, whether it be 33 or 650, there is no practicable or reliable way to make a determination of the approximate size or membership of the class. This deficiency can not be remedied by mere speculation of the size of the class. Rather, sufficient reliable information must be provided by the plaintiffs from which the approximate number of class members can be ascertained before the Court can decide whether joinder is impracticable. Sims v. Parke Davis & Co., *supra.* Considering the long-drawn out and serious effort made to date by the named plaintiffs to determine the approximate size of the class, the plaintiffs have only been able to speculate that the class size ranges from 33 to 650 members. This showing is totally inadequate for the Court to make an informed judgment whether the class size is so large that it would be extremely difficult or inconvenient for joinder or intervention of the class members in this suit. Further-

more, having some reasonable identity and size of the class before certification is a necessity if this action is to be maintained under 23(b)(3) because of the mandatory personal notice requirements of 23(c)(2) to each member of the class. Manual For Complex Litigation § 1.40 (1973); Advisory Committee's Note to Rule 23, F.R.Civ.P., 39 F.R.D. 106–107.

Finally, if we were to engage in pure speculation of the size of the class, it seems likely that the class size would be substantially less than the upside range of 650 members even if substantially less, but still considerable, joinder or intervention of all who might be expected to join may be practicable, e. g., Van Allen v. Circle K. Corp., 58 F.R.D. 562 (C.D.Cal.1972) (149 plaintiffs would not create an unmanageable piece of litigation); Minersville Coal Co., Inc. v. Anthracite Export Association, 55 F.R.D. 426 (M.D.Pa.1971) (330 plaintiffs not so numerous as to make joinder impracticable); City and County of Denver v. American Oil Company, 53 F.R.D. 620 (D.Colo.1971) (joinder of 126 plaintiffs not impracticable); State of Utah v. American Pipe and Construction Company, 49 F.R.D. 17 (C.D.Cal.1969) (joinder of 350 plaintiffs practicable). In the cases just cited the courts concluded from prior actual experience that joinder and intervention were far simpler than a class action, in part because, as a practical matter, those courts recognized that the number of class members who would seek to join the suit if class certification were denied would be far fewer than the numbers alleged. In any event the point is that the plaintiffs have failed under the circumstances of this case to satisfy the Court that the class is so numerous that joinder or intervention is impractical.

The fourth prerequisite of Rule 23(a) provides that a class action can be maintained only if "the representative parties will fairly and adequately protect the interests of the class." A corollary of this proposition is that

a representative cannot adequately protect the class if his interests are antagonistic to or in conflict with the objectives of those he represents with regard to the very subject matter of the litigation. Hansberry v. Lee, 311 U.S. 32, 45, 61 S.Ct. 115, 85 L.Ed. 22 (1940). And it is fairly clear that if the class members themselves have conflicting interests in the subject matter of the litigation so that priorities among them must be determined, then the class action device is improper. Clark v. Chase National Bank of City of New York, 45 F.Supp. 820, 823 (S.D.N.Y.1942).

■ In a treble damage action such as this, the finding of an antitrust violation does not result in liability. The statute creates a private remedy only to the extent that each person has been "injured in his business or property by reason of anything forbidden in the antitrust laws." Clayton Act § 4, 15 U.S.C. § 15. It is this private damage which is an essential element of any plaintiff's cause of action. Haverhill Gazette Company v. Union Leader Corp., 333 F.2d 798, 802 (C.A. 1, 1964), motion den. 333 F.2d 808 (C.A. 1, 1964), cert. den. 379 U.S. 931, 85 S.Ct. 329, 13 L.Ed.2d 343 (1964), reh. den. 379 U.S. 984, 85 S.Ct. 645, 13 L.Ed.2d 578 (1965); Freedman v. Philadelphia Terminals Auction Co., 301 F.2d 830, 833 (C.A. 3, 1962), cert. den. 371 U.S. 829, 83 S.Ct. 40, 9 L.Ed.2d 67 (1962); Wolfe v. National Lead Co., 15 F.R.D. 61, 63 (N.D.Cal.1953). Thus, the determination of an essential element of the present cause of action, i. e., the fact of damage, can only be determined on an individual basis. Hettinger v. Glass Specialty Co., Inc., 59 F.R.D. 286, 294 (N.D.Ill.1973).

■ On the present record, it appears that the representatives of the class and the class members themselves have antagonistic interests with respect to the fact of damage and the amount of damages each suffered. The plaintiffs concede that "it is undisputed that each member of the class, including the representative plaintiffs, is to some extent a competitor of at least one other member of the class." [4] And from the deposition testimony already taken it appears likely that there is always more than one, and in many cases several, distributors competing for the business of each OMC dealer.[5] Thus, it seems clear that the class members, including the representatives, are active business competitors with antagonistic interests which will undoubtedly surface on the essential issue of the fact of damage and the apportionment of damages among themselves. This is so because the individual interests will of necessity vie with each other in establishing that they, as opposed to their neighboring competitors, would have enjoyed a larger portion of the allegedly lost business if it had not been closed to all of them by OMC's allegedly unlawful practices. This action is entirely unlike the typical price fixing or franchise-tying antitrust suit. Many of these latter types of antitrust actions have been certified as class actions despite the fact the class members were competing business men. But in those cases the plaintiffs and class members had a paper record of their purchases and based their individual damage claims on the defendant's alleged overcharges on those recorded amounts of business done. The present action is quite different from those types of suits. This case involves individual claims of business competitors that are based on contested amounts of business *not done* and without the slightest objective guidelines for apportioning individual damages among the class members. This conflict of interest among the class members, including the representatives, on an essential element of the cause of action, viz., the

4. Docket Item 93, p. 14.

5. Docket Item 79, pp. 33–34, 37; Docket Item 81, pp. 45–47, 56–57; Docket Item 72, pp. 29–33, 42.

fact and amount of damages individually suffered, is so overriding under the circumstances of this case that the Court must conclude that the absent class members could not be fairly or adequately protected by the class action device as required by 23(a)(4).[6] Furthermore, how a single set of attorneys, despite their ability and integrity, could adequately balance this conflict among the class members is beyond imagination.

A third reason exists under Rule 23(a)(4) for denying plaintiffs' motion for class action status. There is substantial doubt at this stage of the case whether the plaintiffs can further satisfy Rule 23(a) which requires them fairly and adequately to protect the interest of the class because under the law of this Circuit it now appears uncertain whether the representative plaintiffs have standing to sue OMC on the claims alleged in the second amended complaint. The question becomes: are the representative plaintiffs, as alleged distributors of the marine products in question, persons "injured in [their] business or property" as the courts have interpreted that language in Section 4 of the Clayton Act?[7] The courts of this Circuit have adhered to the proposition that the antitrust statutes were not intended by Congress to provide a remedy in damages for all injuries which might conceivably be traced to an antitrust violation. Rather they have focused on the relationship between the alleged antitrust violator and the claimant and if the claimant is separated from the violator by an intermediate antitrust victim,

standing is denied because the damage is too remote, indirect and consequential. Thus, in Harrison v. Paramount Pictures, Inc., 115 F.Supp. 312 (E.D.Pa.1953), aff'd 211 F.2d 405 (C.A. 3, 1954), cert. den. 348 U.S. 828, 75 S.Ct. 45, 99 L.Ed. 653 (1954), the plaintiff was a non-operating owner and lessor of a moving picture theater, whose lease entitled her to a percentage of theater receipts, subject to a minimum rent. The lessor sued a picture producer and distributor of films alleging that an agreement between the lessee and defendants under which the theater was furnished only "second run" pictures had the effect of lowering the receipts of the theater thereby diminishing the lessor's rental income under the percentage clause. In rejecting the plaintiff's contention, the Court stated:

> " 'Injury' (under § 4 of the Clayton Act) 'implies violation of a legal right.' " 115 F.Supp. at 316.

From that premise it went on to reason:

> "The fact is that while she would have had a right to rental above the minimum, if earned, *she had nothing more than a hope that it ever would be earned.* The tenant could have operated the business, from whatever motive, so as to keep the percentage from ever exceeding the minimum, for example, by cutting admission charges, discounting advertising or showing nothing but foreign language or documentary films, and there would be no right which the plaintiff could have asserted against him in that respect."

---

6. The Court is aware that under Rule 23(c)(4) the Court may divide the class into appropriate sub-classes in order to eliminate antagonism among class members. However, this does not appear feasible in this case without extensive discovery from each and every class member to determine the competition between them. The only alternative to such extensive discovery would be to make each class member a separate sub-class which, of course, would ridiculously destroy all the advantages of this suit as a class action.

7. Section 4 of the Clayton Act, 15 U.S.C. § 15 reads:
"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the costs of suit, including a reasonable attorney's fee."

(Emphasis added). 115 F.Supp. at 316.

In summarizing his views, Chief Judge Kirkpatrick concluded as follows:

"In determining the scope of the Act it must be remembered that the treble damage feature is an enforcement provision and superimposes a penalty upon compensation. As such it should not be literally construed if unreasonable results would be reached by so doing. Obviously, there must be a limit somewhere. It is not possible to formulate any general rule by which to determine what injuries are too remote to bring a plaintiff within the scope of the Act and I shall not attempt to do so. Each case must be dealt with on its own facts. All that is decided here is that this plaintiff's loss, if any, is beyond the limit of injuries cognizable under the anti-trust laws." 115 F.Supp. at 317.

In a *per curiam* opinion, a three-judge panel of the Court of Appeals, finding themselves in "complete accord" with Chief Judge Kirkpatrick's "able and comprehensive" opinion, affirmed.

In Melrose Realty Co. v. Loew's Incorporated, 234 F.2d 518 (C.A. 3, 1956), cert. den. 352 U.S. 890, 77 S.Ct. 128, 1 L.Ed.2d 85 (1956), a case similar on its facts, the Court affirmed the District Court's grant of summary judgment on the basis that the plaintiff-theater owner lacked standing to sue under the Clayton Act on the authority of *Harrison*. The Court stated

". . . The rule thus laid down [in *Harrison*] is sound and we adhere to it. It compelled the entry of judgment for the defendants in this case." 234 F.2d at 519 (Words added).

The rule of *Harrison* and *Melrose* remains the law of this Circuit.[8] Plum Tree, Inc. v. Rouse Company, Inc., 58 F.R.D. 373, 376 (E.D.Pa.1972) (class certifications denied partly on basis of rule), and Minersville Coal Company, Inc. v. Anthracite Export Association, 335 F. Supp. 360, 362–366 (M.D.Pa.1971) (summary judgment granted on basis of the rule; class action status had been previously denied).

As in *Harrison,* it would appear that the plaintiffs here may not have a legal right which they could enforce, and nothing more than a "hope" of earning additional profits if OMC were ordered to change its marketing practices. Just as the owner-lessor's rentals in *Harrison* were wholly dependent upon the practices of the lessee, and beyond the lessor's legal control, so apparently here plaintiffs' potential profits to a large extent are dependent upon original equipment manufacturers ("OEMs") for whom the plaintiffs serve as distributors.

Among the variable factors over which the plaintiff distributors have no control, and which govern their ability to sell the marine products involved, are the following: The OEM's decision to continue to manufacture the respective products that are usable with OMC's outboard motors; the OEM's decision and ability to meet production to meet the anticipated increase in demand for their products; the OEM's ability and inclination to price its products so as to make them competitive in cost with other products on the market; the OEM's ability to manufacture products that are competitive in quality; the amount of advertising done by the OEMs; the OEM's ability or inclination to fill the distributor's purchase

8. The plaintiffs insist that the Third Circuit rule is erroneous and that the better approach to the standing issue is to consider whether the plaintiffs are in the group which can reasonably be expected to feel the impact, i. e., in the "target area" of the defendant's illegal conduct as was done in Karseal Corporation v. Richfield Oil Corporation, 221 F.2d 358 (C.A.9, 1955) and South Carolina Council of Milk Producers, Inc. v. Newton, 360 F. 2d 414 (C.A.4, 1966), cert. den. 385 U.S. 934, 87 S.Ct. 295, 17 L.Ed.2d 215 (1966). This approach apparently has not been accepted by the Third Circuit. See Minersville Coal Company, Inc. v. Anthracite Export Association, *supra.*

orders in a competitively prompt manner; and particularly the OEM's determination to select or continue using a particular distributor as its distributor and the OEM's decision to use or continue using independent distributors in its marketing, rather than using company owned distributors or selling from factory directly to retailers.

None of these matters appear to fall within the "rights" or control of the plaintiff distributors as against their OEMs, as referred to by Judge Kirkpatrick. Because of these numerous and highly variable factors which determine the ability of each plaintiff distributor to make a profit, as well as the amount of the profit, any injuries that they claim to have suffered because of OMC's alleged unlawful practices may be too speculative, indirect and remote to give them standing to bring this action. Of course, if the plaintiff representatives do not have standing to sue on the present claims, they are not adequate representatives of the proposed class. *Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727, 734 (C.A. 3, 1970), cert. den. 401 U.S. 974, 91 S.Ct. 1190, 28 L.Ed.2d 323 (1971).

While it is unnecessary at this stage to decide whether the named plaintiffs have standing to sue, it is apparent at present that a substantial doubt does exist with respect to that question. When such a doubt exists, it is a factor to be considered whether the case should be certified as a class action. *Plum Tree, Inc. v. Rouse Company, Inc., supra* at 376; *City and County of Denver v. American Oil Co.*, 53 F.R.D. 620, 638 (D. Colo.1971).

The Court concludes that the prerequisites set forth in Rule 23(a)(1) and (4) for maintaining a class action have not been fulfilled and while this alone would prevent the suit from being certified, the Court will heed the Court of Appeals' direction and make the findings required by Rule 23(b)(3). *Katz v. Carte Blanche*

*Corporation*, 496 F.2d 747, 756 (C.A. 3, 1973).

## III. RULE 23(b)(3) REQUIREMENTS.

As previously noted the putative plaintiffs seek to have this suit certified as a 23(b)(3) class action.[9] The Court agrees that, since the recovery of treble damages appears to be the predominate consideration even though injunctive relief is also sought, if the case is maintainable as a class action at all, it should be classified as one maintainable under Rule 23(b)(3) rather than 23(b)(1) or (2). This is so because 23(b)(1) actions are properly confined to those causes in which there is a total absence of individual issues. *Tober v. Charnita, Inc.*, 58 F.R.D. 74, 81 (M.D.Pa.1973); *Kristiansen v. John Mullins & Sons, Inc.*, 17 F.R. Serv.2d 101, 105 (E.D.N.Y.1973). 23 (b)(2) is inapplicable because the primary claim here is for treble damages and 23(b)(2) is only applicable where the relief sought is exclusively or predominately injunctive or declaratory in nature. *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 564 (C.A. 2, 1968); *Walker v. City of Houston*, 341 F.Supp. 1124, 1131 (S.D.Tex.1972). Accordingly, the Court concludes that if the action were to be certified as a class action, it should be classified as a Rule 23(b)(3) action as prayed for by the plaintiffs.

However, to be properly certified as a Rule 23(b)(3) class action, the Court must find as previously indicated (1) that the questions of law or fact common to the class members predominate over any questions affecting only individual members, and (2) that the class action is superior to other available methods for the fair and efficient adjudication of the controversy.

While admittedly there are some questions of law and fact that are common to the proposed class, such as OMC's sales practices with respect to the five marine products involved and OMC's

---

9. Docket Item 93, pp. 16–23.

54

market position, these limited issues are overshadowed by the numerous other questions of law and fact which affect only the individual members. As heretofore noted, in an antitrust treble damage suit, the fact of damage to a particular plaintiff is an essential element of his cause of action. Knuth v. Erie-Crawford Dairy Coop. Association, 395 F.2d 420, 423 (C.A. 3, 1968). Therefore, each of the named plaintiffs and the purported members of the class must individually prove that each in fact has been injured in his business or property by the alleged antitrust violations of OMC, doing so with respect to each of the marine products involved. For example, in order for the named plaintiffs and the members they purport to represent to prove the *fact of damages* as to each of the marine products in suit, they must individually demonstrate among other things (a) that they distributed the competitive product, (b) that the product was designed to be used with OMC's outboards, (c) that they sold these particular products to OMC dealers, (d) that if OMC's marketing practices had been proper, they would have been able to sell more of such products to OMC retail dealers, and (e) that their additional sales would have constituted a substantial amount of commerce. Subsidiary to this proof there are other fact questions of a highly individualistic nature which must be established by each class member, for example, the marketing area in which the class member does business, competition within the area, the class member's pricing policies, its business reputation in the community, the price and quality of the product it sells in competition with OMC's product, and perhaps the subjective preferences of the

particular OMC retail dealer served by a particular distributor-class member.

Furthermore, historical sales of the products in suit by the many distributors to OMC retail dealers will be a relevant factor in determining the quantity of alleged lost sales. However, according to deposition testimony the named plaintiffs have no records other than customer invoices for determining quantities and prices of sales of specific products to particular dealers and hence an invoice search is the only feasible method for determining retail sales and prices of the marine products in question.[10] The total number of invoices that must be searched by each of the named plaintiffs is estimated in the tens of thousands for each distributor.[11] Tri-State Marine, Inc. characterized the mere determination of the number of propellers it has sold to OMC retail dealers as a "monumental task."[12] Similar tasks of like proportions can be expected with respect to each member of the class as to each of the marine products involved.

Also each of the OMC dealer-customers of the plaintiff distributors has more than one distribution source for the products in suit.[13] Thus, it will be necessary in every case to go to the OMC retail dealer himself to determine what portion of added business that dealer would probably have apportioned to each of its distributor-suppliers,[14] postulating prices and other relevant data.

It is quite clear at this point that the present class action involves numerous highly individualistic factual and legal issues relating to the fact of and amount of damages as to each member of the proposed class which predominate over the very limited common questions of law and fact.

10. Docket Item 72, pp. 92–94, 120–121; Docket Item 81, pp. 101–102, 124–125, 133; Docket Item 79, pp. 28, 54–55, 115–117, 124, 180, 196–197.

11. Docket Item 11, Int. 4; Docket Item 18, Int. 43; Docket Item 79, pp. 196–197; Docket Item 81, pp. 124–125.

12. Docket Item 79, pp. 115–116.

13. Docket Item 81, pp. 56–58; Docket Item 79, p. 37.

14. Docket Item 79, pp. 119–120.

The named plaintiffs and the *amicus* suggest that all of these numerous and individual issues relating to the fact of damages and amount of damage could be easily handled in a class suit by a collective or fluid type of recovery based on average profits or average awards to the class members. However, it has been pointed out that individual questions arising from damage claims can not be solved by allowing damages in a treble damage antitrust case in the form of a fluid recovery because average awards erode due process. Eisen v. Carlisle & Jacquelin, 479 F.2d 1005, 1013–1014 (C. A. 2, 1973) ; [15] In re Hotel Telephone Charges, 500 F.2d 86 (C.A. 9, 1974). In the latter case the Court speaking to that type of recovery stated:

"The appellees have argued that many of the individual questions arising from the damage claims can be solved by allowing damages in the form of fluid recovery. . .. . We agree with the decision reached in Eisen v. Carlisle & Jacquelin, 479 F.2d 1005 (2d Cir. 1973) that allowing gross damages by treating unsubstantiated claims of class members collectively significantly alters substantive rights under the antitrust statutes. Such enlargement or modification of substantive statutory rights by procedural devices is clearly prohibited by the Enabling Act that authorizes the Supreme Court to promulgate the Federal Rules of Civil Procedure."

The named plaintiffs in support of their motion for certification list eleven treble antitrust cases [16] in which courts have found that common questions of law and fact predominate over questions affecting only individual members. However, an analysis of those cases show they fall into two basic categories: (1) franchise situations and (2) direct purchases from an allegedly price-fixing defendant or defendants or their distributors. In the franchise situation, all members of the would-be plaintiff class are franchisees typically complaining of tying practices, exclusive dealing requirements, price discriminations, and conspiracies to restrain and monopolize trade. As the court pointed out in Siegel v. Chicken Delight, Inc., 271 F.Supp. 722, 726 (N.D. Cal.1967) : [17]

". . . the franchise agreement is the focal point of the alleged acts perpetrated by the defendants to fix prices, to tie-in product sales, to discriminate among the franchisees as to

---

15. The Supreme Court in reviewing the Eisen case left standing that part of the Court of Appeals decision which discussed the impropriety of so-called fluid recoveries. Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

16. Siegel v. Chicken Delight, Inc., 271 F.Supp. 722 (N.D.Cal.1967), an action brought by 650 franchisees against the franchiser for conspiring in restraint of trade, monopolization and attempted monopolization, exclusive dealings and tie-in sales and price discrimination; State of Minnesota v. United States Steel Corp., 44 F.R.D. 559 (D.Minn. 1968) price fixing conspiracy; State of Illinois v. Harper & Row Publishers, Inc., 301 F.Supp. 484 (N.D.Ill.1969) ; State of Iowa v. Union Asphalt and Roadoils, Inc., 281 F. Supp. 391 (S.D.Iowa 1968), aff'd 409 F.2d 1239 (C.A.8, 1969) ; In re Antibiotic Antitrust Actions, 333 F.Supp. 267 (S.D.N.Y. 1971) ; City of Philadelphia v. Morton Salt Company, 248 F.Supp. 506 (E.D.Pa.1965) ;

City of Philadelphia v. American Oil Company, 53 F.R.D. 45 (D.N.J.1971) price-fixing conspiracy; Gold Strike Stamp Co. v. Christensen, 436 F.2d 791 (C.A.10, 1970) restraint of trade monopolization, exclusive dealing and price discrimination; City of Philadelphia v. Emhart Corp., 50 F.R.D. 232 (E.D.Pa.1970), territorial and market allocations; Kainz v. Anheuser-Busch, Inc., 194 F.2d 737 (C.A.7, 1952), cert. den. 344 U.S. 820, 73 S.Ct. 17, 97 L.Ed. 638 (1952), price discrimination; Butkus v. Chicken Unlimited Enterprises, Inc., 15 F.R.Serv.2d 1067 (N.D. Ill.1971) tying arrangments and price fixing.

17. In the *Siegel* case, the Ninth Circuit later ordered the price discrimination claim to be dropped from the class action because "determination of such issue would involve significantly different evidence and separate factual determinations as to each separate franchisee. . . . " Chicken Delight, Inc. v. Harris, 412 F.2d 830, 831 (C.A.9, 1969).

prices charged, and to compel or coerce compliance by the threat of franchise cancellation."

The same is true as to the second category of cases relied upon by the plaintiffs, i. e., those involving alleged conspiracies to fix prices, members of the class are those who have bought from the defendant or defendants or their distributors at allegedly inflated prices. In both categories of cases, the members of the classes and the transactions could be determined from defendants' business records.

In the present case, these important direct links between the defendant and the putative class do not exist. Membership in the class and the damage issues are not capable of determination by simply referring to OMC's business records because there were no dealings between the defendant and the proposed class members, such as an underlying franchise agreement or purchase of merchandise. Coping with such a situation would render the case unmanageable, involving the parties and Court in a multitude of drawn-out, vague, cumbersome estimates and speculations.

It is this Court's judgment that the limited number of common issues of fact and law which exist do not predominate in this case over the numerous factual and legal issues which can only be determined on an individual basis. Accordingly, the Court finds that the "predominance" requirement of Rule 23(b)(3) has not been met.

■ Turning now to the second and very important prerequisite to the maintenance of a 23(b)(3) suit the Court must find on plaintiffs' showing that a class action is "superior" to other available methods for the fair and adequate adjudication of the controversy. Free World Foreign Cars, Inc. v. Alfa Romeo, 55 F.R.D. 26, 29 (S.D.N.Y.1972). From what has already been said, the Court finds that the plaintiffs have failed to sustain their burden of showing "su-

periority" of the class action. Given the total amount of damages of $40,000,000 prayed for in the complaint to be recovered by a class estimated to be between 33 and 650 members, it seems unlikely that the individual class members would have no interest in controlling the prosecutions of their actions. Rule 23(b)(3)(A). We do not have an anti-trust action where the claims are alleged to be so small that without a class action the members would not have their day in court. Hawaii v. Standard Oil Co., 405 U.S. 251, 266, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972). In addition to the claimed substantial recovery apparently sought by each class member if they brought their own suit, each would be entitled to the recovery of costs and reasonable attorney fees which should make it fairly easy for the individual class members to obtain counsel to litigate their claims. Katz v. Carte Blanche Corporation, 496 F.2d 747, 761 (C.A. 3, 1974).

With respect to desirability or undesirability of concentrating the litigation in this district, a factor mentioned in 23(b)(3)(C), the Court finds no particular benefit or detriment. The plaintiffs make much of the fact that this Court is familiar with the cable and electric shift control box aspect of this litigation in view of its decision in N.W. Controls, Inc. v. OMC, 333 F.Supp. 493 (D.Del. 1971), but this is of small value in the present case since the defendant has demanded a jury trial on all the claims including marine products which were not covered by the earlier decision.

Finally, the Court believes that the difficulties to be encountered if this case proceeds as a class action would render the suit completely unmanageable. Rule 23(b)(3)(D). For one thing, as previously noted the question of the fact of damages to each class member is an essential element to finding liability as to that member and since OMC has demanded a jury trial, a real problem becomes apparent. Admittedly, whether separate trials to separate juries is con-

stitutionally permissible has not been authoritatively decided, but courts have cautioned that where the issue of fact of damages and a violation of antitrust laws are so intertwined and essential to a finding of liability it may not be constitutionally possible to separate these issues of liability before different juries without the defendant's consent. Manual of Complex Litigation (1973) ¶ 4.12; Lah v. Shell Oil Co., 50 F.R.D. 198, 200 (S.D. Ohio, 1970).

The Court concludes on the present record that there would be no substantial saving of time to the Court or the parties if this suit were certified as a class action. The individual issues relating to each absent class member, even if the members were known with any certainty, would require a plethora of mini-trials within an overall mammoth case. The unmanageability of a case with such diverse individualistic issues would be further complicated to the point of incomprehensibility by jury problems. The conclusion reached by the court in the *Hettinger* case *supra*, applies with equal force to the present case and the Court adopts the following statement of Judge Bauer:

> "As a practical matter the capacities of even the best judges and jurors to absorb the factual situation presented are finite and the capacity of the courthouse does not begin to reach that of a coliseum. A class action in the instant case would stretch the facilities and abilities of this Court beyond their elastic limit.
>
> "Given the large number of individual questions of law and fact, the ability of the named plaintiffs to carry forth the litigation on their own, and the problems of manageability, a class action is not superior to other methods of adjudicating the instant action."

59 F.R.D. at 294–295.

Concluding that the prerequisites of Rule 23(a)(1) and (4) and the requirements of Rule 23(b)(3) have not been met in the present case, the Court will deny the named plaintiffs' motion for certification of this suit as a 23(b)(3) class action.

This decision does not, of course, end this law suit. The denial of certification does not prevent the named plaintiffs from pressing forward with their claims. There appears to be sufficient incentive of monetary and injunctive awards for the named plaintiffs to continue. Finally, should any proposed class members decide to institute suit on their own behalf against the defendant, the options of joinder under Rule 20, F.R.Civ.P., or intervention under Rule 24, may be available.

### ORDER

For the foregoing reasons, the motion of the named plaintiffs for the entry of an order pursuant to Rule 23(c)(1), F.R. Civ.P., to maintain this as a class action under Rule 23(b)(3) is hereby denied.